2019 IL App (1st) 180710-U
No. 1-18-0710

SECOND DIVISION
December 24, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 16970 |
| | ) | |
| SEAN RILEY, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Catherine Marie Haberkorn, |
| | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's conviction of aggravated driving under the influence of alcohol is affirmed, where (1) evidence showed defendant struck a pedestrian with his truck without slowing down, had glassy eyes and smelled of alcohol, and was unresponsive and unable to walk steadily; (2) the trial court did not base its judgment on any inaccurate recollections of the facts in evidence; and (3) defendant's right to remain silent was not violated, as his unresponsive conduct following the accident was physical evidence of impairment and not testimonial evidence.

¶ 2    Following a bench trial, defendant Sean Riley was found guilty of aggravated driving under the influence of alcohol and sentenced to 6½ years' imprisonment. On appeal, Riley argues that (1) the State failed to prove him guilty beyond a reasonable doubt, where he passed his field

sobriety tests, the State's witnesses presented conflicting testimony, there was no credible testimony regarding "the typical indicators of impairment," and there was no evidence that Riley's driving proximately caused the victim's injuries; (2) the trial court wrongfully considered facts not in evidence when finding him guilty; and (3) the trial court violated his fifth amendment right to remain silent and the "no comment rule" by considering his silence as evidence of guilt. We affirm.

¶ 3     BACKGROUND

¶ 4     Riley was charged by indictment with two counts of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(a), (d)(1)(F), (d)(2)(G) (West 2014)), following an incident in Chicago on August 24, 2014.

¶ 5     At trial, Chicago police officer Alejandro Vargas testified that on August 24, 2014, at about 8:24 p.m., he was off-duty, wearing plain clothes, and driving to work on the left eastbound lane of North Avenue. Vargas drove "just over 40 miles per hour," even though the speed limit was 30 miles per hour. At the intersection of North and California Avenue, Vargas saw a pickup truck "about a car-and-a-half to two cars" ahead in the right eastbound lane of North. Vargas noticed the truck was "going faster than" him, as Vargas "wasn't gaining" on the truck. Then, about "a half block ahead," he saw a pedestrian, Jose Serrano-Collazo, holding a can and a plastic bag at the intersection of North and Washtenaw Avenue. There were streetlights at that intersection, but no traffic lights or stop signs. At the crosswalk on the west side of Washtenaw, Serrano-Collazo walked three-fourths of the way southbound across North.

¶ 6     Vargas was able to slow down, and Serrano-Collazo passed his traffic lane. However, Vargas did not notice the pickup truck reduce speed and "didn't see taillights on." Vargas saw Serrano-Collazo walk in front of the truck and heard a "nasty sound" like "bones breaking and metal crashing." The truck drove about a quarter of a block and pulled over to the curb.

¶ 7       Vargas parked behind the pickup truck and exited his vehicle. Then, Riley exited the pickup truck from the driver's side door. Vargas asked Riley where he was going, and Riley "mumbled something unintelligible" but "didn't respond." Rather, Riley "just started walking in a catatonic state" in Vargas's direction toward Serrano-Collazo. Riley had an "unsteady gait," was "kind of stumbling, stiff legged," and "looked to be in a state of intoxication." Riley walked by Vargas without making eye contact, and Vargas smelled "an odor of alcohol" wafting from Riley's body "like the wind blew."

¶ 8       Then, Vargas approached the pickup truck and saw a big dent on the hood with the right headlight smashed. Vargas confirmed that a photograph entered into evidence reflected this damage, along with Serrano-Collazo's plastic bag, which was tangled in the vehicle's broken signal light. After Vargas observed the truck, he saw Riley "get close" to Serrano-Collazo and "kind of just stand*** there *** looking." A police vehicle arrived at the scene within a minute of the accident. Vargas observed the truck once more, walked back toward the scene, and saw an officer escort Riley to a police vehicle. Vargas opined that Riley was under the influence of alcohol while he was driving the pickup truck, based on Riley's smell of alcohol, "unsteady gait," "unfixed" stare, and the fact that Riley "didn't respond to [Vargas] in an intelligible manner" and "just kept walking."

¶ 9       On cross-examination, Vargas stated that the streetlights near the accident were not on, and that he did not see Riley's truck strike Serrano-Collazo. Rather, he saw Serrano-Collazo walk in front of Riley's truck and "disappear***" and then heard a "crash." He also clarified that he saw Serrano-Collazo hold a beer can when crossing North but did not see Serrano-Collazo drink the beer. Additionally, Vargas stated that after interacting with Riley, he saw Sergeant Heather

Daniel's vehicle approach "[a]s soon as [he] turned around," and he saw Officer Cecchin[1] arrest Riley. Vargas did not see Daniel exit her vehicle. He also denied making any notes or reports on his observations from that night.

¶ 10    Chicago police sergeant Daniel testified that she drove eastbound on North and saw a group of people standing around a person laying in the street. Daniel parked her vehicle and approached the person on the ground, who was unconscious and "looked mangled." The group of people pointed out a pickup truck less than a block away. Daniel approached the truck, Riley exited the truck and walked towards her, and Daniel grabbed Riley's arm. Daniel noticed Riley's eyes were "glassy," and he had a "far away look," "seemed *** out of touch," and smelled like alcohol. Riley said, "I'm scared," in a tone that was "[v]ery quiet and seemed a bit slurred." Then, Daniel "took hold of his arm" and "walk[ed] him back" towards her vehicle. She noticed Riley "walk[ed] very slowly." Cecchin and Officer Alfredo Mendez arrived in another police vehicle and placed Riley in the back seat of their vehicle.

¶ 11    On cross-examination, Daniel testified that she did not see Riley stand over Serrano-Collazo when she arrived, and she did not see Vargas until after Riley was placed in a police vehicle. While she noticed Riley "walk[ed] extremely slowly," she did not recall him having balancing issues. She also stated she did not prepare any reports on the incident, but she was on patrol "[i]n a supervisory capacity."

¶ 12    Chicago police officer Isidor Ramos testified that he arrived at the scene of the accident and saw Riley handcuffed at the back of a squad vehicle with Officers Cecchin and Mendez "standing to the side." He spoke with Daniel, who directed him to Riley's vehicle located "about three storefronts" east of Washtenaw. Ramos noticed that the vehicle had dents on the hood and

---

[1] The first name of Officer Cecchin does not appear in the transcript of the trial proceedings.

wheel well and a dislodged headlight. At about 11:41 p.m., over three hours after the accident, Ramos joined Mendez in the police station's processing room, saw Riley sleeping and handcuffed to a bench, and noticed a "very strong smell of alcohol" upon entering. Ramos remained at the station for another three hours to finish his case report and assist in processing Riley's arrest, which "was for DUI." Ramos could smell alcohol every time he reentered the processing room, where Riley remained sleeping.

¶ 13    Ramos opined that Riley was under the influence of alcohol when the accident occurred, based on the smell of alcohol in the processing room. Ramos also believed Riley was under the influence because most people who experienced an accident would "be worried about the well-being of the person that they were in the accident with as well as *** what's going to happen to me next." Riley, however, was "not capable" of doing that and was "just sleeping." Defense counsel objected, stating that Ramos was improperly drawing a conclusion based on Riley's silence. The trial court overruled the objection and explained, "He's just talking about [Riley] sleeping and what that means to him." Ramos then stated, "I really think that somebody will be *** aware *** of what's going on at that point when you're being processed as an arrestee and *** people tend to [ask], hey, what's going to happen to me next ***." Defense counsel objected again, and the court sustained the objection "as to any statements from the defendant," but allowed Ramos to testify based on Riley's sleeping.

¶ 14    On cross-examination, Ramos testified that when he arrived at the scene, Riley was outside the police vehicle, and Ramos did not observe Riley sway or lose balance "[a]t that time." Ramos prepared the traffic crash report and ticket, but did not have the notes he took at the scene. He confirmed that the traffic crash report and ticket were prepared for "[s]triking the pedestrian in the roadway" and "[f]ailure to use due care." The narrative portion of the report, however, did not

state that Ramos thought Riley was under the influence. Ramos denied writing in his report that Daniel told him there was "a possible DUI," or that Vargas told him he believed Riley was under the influence. He also denied that he was the arresting officer and stated he did not write the arrest report.

¶ 15    Chicago police officer Cecchin testified that he and his partner, Mendez, arrived at the scene at about 8:25 p.m. and saw a crowd gathered around Serrano-Collazo, who was motionless on the ground past the western crosswalk of North. Daniel pointed out Riley, who was "walking very slowly *** like he was walking on ice" between Riley's vehicle and Serrano-Collazo. Riley's "eyes were very droopy, glassy and he had a strong odor of alcohol." Cecchin handcuffed Riley and placed him in Cecchin's squad vehicle. Cecchin was then directed to Riley's vehicle, which had "front end damage" and "dents to the hood."

¶ 16    Inside the squad vehicle with Riley, Cecchin noticed a "strong odor of alcohol." When they arrived at the police station, Cecchin and Mendez grabbed Riley by the arm and walked him to the entrance. Cecchin again noted that Riley walked at a "slow, deliberate pace." Cecchin asked Riley if he "had any drinks that night," and Riley stated, "[Y]es, I had a few." About 30 minutes after the accident, Cecchin also asked if Riley wanted to do any field sobriety tests, but Riley "said no." Cecchin remained at the police station with Riley for over two hours, and noticed that Riley was still "glassy eyed," his "balance was not good," and his breath smelled strongly of alcohol. Riley also had "a hard time keeping his eyes open." Cecchin stated his opinion that Riley was "highly intoxicated."

¶ 17    On cross-examination, Cecchin testified that at the scene, Riley was "between the victim and his vehicle," but Cecchin could not recall Riley's exact location. Cecchin also could not recall Daniel or Vargas walking with Riley, and Cecchin did not see Riley stand over Serrano-Collazo.

Additionally, Cecchin testified that he started Riley's arrest report, which did not state that Cecchin believed Riley was "highly intoxicated," or that Riley had poor balance or glassy eyes.

¶ 18    The testimony of Mendez largely corroborated the testimony of Cecchin. In corroboration with the other testifying officers, Mendez stated that Riley had "glassy eyes" and "a strong odor of alcohol," but added that Riley's face was red. Mendez also noticed that Riley had "difficulty maintaining balance" when entering the police station. At the police station, Mendez stated that he placed Riley in a "holding cell." Just before 1:40 a.m., Mendez and Officer Macapagal[2] left the station with Riley to perform field sobriety tests in front of a police vehicle's dashboard camera. Mendez noted that Riley had "difficulty maintaining balance" while performing the walk-and-turn test and one-leg stand test. Macapagal asked Riley if he wanted to take a breathalyzer test, and Riley stated, "I really don't want to." The State published to the court the video footage of the field sobriety tests.[3] Mendez stated his opinion that Riley "was too intoxicated to be operating a vehicle" that night.

¶ 19    On cross-examination, Mendez stated that when he arrived at the scene, Daniel was "[a] few feet" from Riley. At the station, Mendez checked on Riley every 10 to 15 minutes, but never saw Riley sleep in the processing room or holding cell. He also confirmed that based on the video of the field sobriety test, Riley did not sway or have difficulty balancing. Further, Riley walked a straight line, did not stop walking to steady himself, and did not lose his balance. Mendez confirmed that he prepared the arrest report with the assistance of Cecchin and Macapagal. He stated that he wrote in the report that a strong odor of alcohol came from Riley. However, the

---

[2] The first name of Officer Macapagal does not appear in the transcript of the trial proceedings.
[3] While Riley raises challenges regarding the video evidence on appeal, the record before us does not contain the video.

report did not mention that Riley's face was red, that his eyes were glassy, or that he had difficulty balancing at the scene and police station entrance.

¶ 20　Chicago police traffic specialist and investigator Enrique Mellado testified that at 10:55 p.m., he, his partner Investigator Bond, and Investigator Musial arrived at the scene. At the west crosswalk of North Avenue, Mellado saw "a field of glass" and "a partially crushed beer can." East of the crosswalk, there was a black plastic bag, a pool of blood, gym shoes, small vehicle parts, and Riley's vehicle further down. The hood of Riley's vehicle was "creased and dented"; the vehicle's front right headlight, turn light, fog light, and bumper were dislodged and hanging; and pieces of a black plastic bag were in the dislodged lights. There were also tire marks beginning "just east" of the west crosswalk on North Avenue, continuing east for about 70 feet, and arcing away from and then back toward the curb.

¶ 21　Mellado took multiple photographs entered into evidence, including photographs of the scene of the accident, the vehicle that Riley drove, and the debris and objects surrounding the scene. Mellado confirmed that in one of two photographs depicting the intersection of North and Washtenaw, he "turned off the flash because without the flash you could see more detail of the evidence on the roadway." He also testified that streetlights at the scene that were working properly. Further, the roadway at the scene was dry and had no defects, and "visibility was at 10 miles." After investigating the accident, Mellado reached the opinion that Riley "failed to maintain proper control of the vehicle in order to adequately *** change lanes to avoid a pedestrian or any other hazards that may be on the roadway."

¶ 22　On cross-examination, Mellado stated that the only "special lighting" he had access to was the flash on his camera. As to the tire marks seen near the accident, Mellado confirmed that the swerving motion away from and towards the curb could "[p]ossibly" indicate evasive movement.

¶ 23    Chicago Fire Department paramedic John Chartrand testified that at approximately 8:30 p.m., he arrived at the scene with his partner in an ambulance. According to Chartrand, "[i]t was dark," but there were streetlights on at the time. Chartrand observed fractures on Serrano-Collazo's skull and throughout the right side of his body. Serrano-Collazo was unconscious and neither speaking nor breathing, but Chartrand detected a pulse. By 8:36 p.m., Serrano-Collazo no longer had a pulse.

¶ 24    The State entered into evidence by stipulation the postmortem examination of Serrano-Collazo, who had external injuries to his head and neck; contusion to the left temple, left check, and left side of the nose; a hemorrhage; "dislocation of the joint of the head and neck area"; multiple abrasions to the thorax and abdomen; a fracture to the right rib area; and multiple abrasions, ecchymosis, lacerations, and fractures in the arms and legs. The parties stipulated that the doctor who conducted the examination would give the opinion that Serrano-Collazo died due to his multiple injuries. Serrano-Collazo's body also tested positive for "elevated alcohol levels."

¶ 25    The defense entered a stipulation that if called to testify, Investigator Bond would state that she spoke with Daniel at the scene, and Daniel did not say Riley had slurred speech, "glassy eyes, a faraway look, or walked slowly." Rather, Daniel told her there was a smell of alcohol when Riley exited his vehicle, but Daniel could not confirm the smell came from Riley.

¶ 26    The trial court found Riley guilty of aggravated driving under the influence of alcohol. The court found the State had showed that alcohol rendered Riley incapable of driving safely. The court noted the inconsistencies in the testimony of the State's witnesses, but found this did not affect the witnesses' credibility "considering the scene, the nature of the injuries, the death of a person laying in the middle of a street, that different officers had different responsibilities and were coming from different angles." Moreover, some officers concentrated on the group gathering at the scene, while

others were focused on Riley or Serrano-Collazo. The trial court stated that "a sergeant *** testified that the defendant needed help or she assisted him by his arm [and] walk[ed] him to the actual car." There was also testimony regarding Riley's smell of alcohol, walk and speech, his bloodshot eyes, his failure to pass sobriety tests, and his refusal to take the breathalyzer test. The court stated that the circumstantial evidence was "abundant," and that it was combined with an off-duty officer's eyewitness testimony of the accident. While there were "very few or slight failures of the field sobriety tests," the video of the tests revealed that Riley occasionally needed to support himself, was unsteady, and needed help walking. The court also stated that Riley "appear[ed] to have glassy eyes" in the video.

¶ 27    As to Riley's driving, the trial court recounted that Vargas testified he drove over the speed limit when Riley "sped past him," and Vargas had "full view of the defendant in his vehicle." Further, "a reasonable person should have been able to see someone in the crosswalk," and Vargas "was able to adjust his own driving mechanism so that he could in fact slow down as a reasonable person should have done upon seeing someone in the crosswalk." Yet there "was no indication" that Riley's brake lights turned on, and there were tire marks from the point of the accident to the location where Riley's vehicle was parked. The photographs and testimony also showed that Riley did not apply his brakes until just before, or at the moment, he struck Serrano-Collazo. Upon impact, Riley "kept going after that" and "ran over [Serrano-Collazo's] body," "to the point that [the] body went up in the air," and Serrano-Collazo's "shoes ended up on opposite sides of the street." The court then observed the "investigating officer at the scene" believed that Riley was impaired, and that "a reasonable person would have been able to adjust their speed *** and *** direction of driving as to avoid a human being in the crosswalk." The court further stated that Riley

"ran over the body" and "kept going after that," "to the point that that body went up in the air, the shoes ended up on opposite sides of the street."

¶ 28     The court also stated that the "lighting in the pictures *** speaks for [itself]," as there was "overhead lighting," and witnesses testified "they definitely could see." Based on the photographs, there "seemed to be definitely enough lighting to be able to see a human being." The court additionally stated that the lighting in the photographs was "sufficient to see all the way down the block."

¶ 29     As to Riley's objection that his right to remain silent was violated, the court stated:

"[O]f course you have the right to remain silent and the right not to incriminate yourself, but there was nothing to indicate that there was any concern whatsoever about the condition of the victim or, you know, what happened to the victim. And I'm not at all considering anything of your refusal to talk or not talk. Just your actions of not looking at him, not going to see if something was okay, and not hurrying and rushing over to them to see they were okay or calling for help, none of those things existed, which are also indications of some impairment."

¶ 30     The court also noted:

"There was much ado about the fact that the officers didn't indicate in their reports anything about the defendant being under the influence, but they are charging him with aggravated driving under the influence of alcohol. The charge itself shows that it's driving under the influence of alcohol. So that's what they were processing him for. So certainly they were looking at driving under the influence of alcohol."

The court also stated while it was "unusual" that there were so many testifying officers who did not prepare reports, the testimony showed that the officers who were assigned to prepare reports did so.

¶ 31    Riley brought a post-trial motion, alleging in relevant part that the State failed to prove him guilty beyond a reasonable doubt, that the trial court considered facts not in evidence, and that the court improperly considered defendant's silence at the scene as evidence against him. The trial court denied Riley's motion,[4] and sentenced Riley to 6½ years' imprisonment for one count of aggravated driving under the influence of alcohol. This appeal followed.

¶ 32    ANALYSIS

¶ 33    I. Sufficiency of the Evidence

¶ 34    On appeal, Riley first argues the State did not prove him guilty beyond a reasonable doubt where there was no credible evidence showing he exhibited the "typical indicators of impairment," there was no evidence that his driving proximately caused Serrano-Collazo's injuries, the evidence did not show he failed his field sobriety tests, and the State's witnesses lacked credibility. The State responds that the evidence sufficiently showed Riley drove under the influence of alcohol and proximately caused Serrano-Collazo's death. Moreover, Mendez testified that Riley swayed and had difficulty balancing during the field sobriety tests, and the officers testified to "the same, or substantially similar," factors supporting Riley's conviction.

¶ 35    Under the due process clause of the fourteenth amendment to the United States Constitution, a person may not be convicted in state court "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (Internal quotation

_____

[4] At the conclusion of the hearing on defendant's posttrial motion, the trial court continued its ruling to a later date. The transcript of the trial court's ruling does not appear in the appellate record.

marks omitted.) *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004); U.S. Const., amend. XIV.

When reviewing the sufficiency of the evidence at trial, our inquiry is " 'whether, after viewing

the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)

*People v. Jackson*, 232 Ill. 2d 246, 280 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19

(1979)). This standard applies "regardless of whether the evidence is direct or circumstantial

[citation], and regardless of whether the defendant receives a bench or jury trial [citation]."

(Internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007).

¶ 36    We will not retry a defendant when considering a sufficiency of the evidence challenge.

*Id.* Thus, we cannot substitute our judgment for that of the finder of fact on questions concerning

the weight of the trial evidence or credibility of the witnesses. *People v. Hardman*, 2017 IL 121453,

¶ 37. When weighing the evidence, "the trier of fact is not required to disregard inferences which

flow normally form the evidence before it, nor need it search out all possible explanations

consistent with innocence and raise them to a level of reasonable doubt." (Internal quotation marks

omitted.) *Id.* "Minor inconsistencies in the testimony between witnesses or within one witness's

testimony may affect the weight of the evidence but do not automatically create a reasonable doubt

of guilt." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 (citing *People v. Adams*, 109 Ill. 2d

102, 115 (1985)). When reviewing whether the evidence at trial was sufficient, "[w]e will not

reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or

unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Newton*, 2018 IL

122958, ¶ 24.

¶ 37    To prove that a defendant committed aggravated driving under the influence of alcohol,

the State must first show that the defendant committed misdemeanor driving under the influence

of alcohol, as defined under section 11-501(a) of the Illinois Vehicle Code (625 ILCS 5/11-501(a) (West 2014)). *People v. Martin*, 2011 IL 109102, ¶ 14. Section 11-501(a)(2) provides that "[a] person shall not drive or be in actual physical control of any vehicle within this State while *** under the influence of alcohol." 625 ILCS 5/11-501(a)(2) (West 2014). A person who violates this section commits aggravated driving under the influence of alcohol if "the person *** was involved in a motor vehicle *** accident that resulted in the death of another person, when the violation *** was a proximate cause of the death." 625 ILCS 5/11-501(d)(1)(F) (West 2014). Accordingly, the State was required to prove that Riley was in control of a vehicle while under the influence of alcohol, and proximately caused the death of Serrano-Collazo.

¶ 38    A person is under the influence of alcohol where "as a result of drinking any amount of alcohol, his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." (Internal quotation marks omitted.) *People v. Morris*, 2014 IL App (1st) 130512, ¶ 20. A driving under the influence conviction may be sustained solely on the testimony of the arresting officer, if credible (*People v. Janik*, 127 Ill. 2d 390, 402 (1989)), or solely on circumstantial evidence (*People v. Morris*, 2014 IL App (1st) 130512, ¶ 20). Testimony that a defendant smelled of alcohol or had glassy eyes is "relevant and admissible evidence" (*Id.*), as is evidence that a defendant refused to submit to a breathalyzer test (*People v. Garriott*, 253 Ill. App. 3d 1048, 1051-52 (1993)).

¶ 39    The evidence at trial showed that Officer Vargas saw a truck drive over the speed limit towards a crosswalk on North, saw Serrano-Collazo "walk in front" of the truck and "disappear***," and heard a crash. Vargas then saw Riley step out of the truck. Vargas observed that Riley "mumbled something unintelligible"; had a "stumbling, stiff legged," and "unsteady" walk; smelled strongly of alcohol; and had an "unfixed" stare. Vargas also observed that the truck

Riley exited had a dented hood and smashed headlight. Sergeant Daniel and Officers Ramos, Cecchin, and Mendez testified that they observed similar traits indicating that Riley was impaired. Ramos, Cecchin, and Chicago police traffic specialist Mellado also presented strongly consistent evidence regarding the damage they observed on the truck Riley exited. Ramos added that Riley slept on a bench for about three hours while at the police station. Additionally, Mendez stated that Riley did not take a field sobriety test until five hours after the accident but still had difficulty balancing, and Riley refused to take a breathalyzer test. See *Garriott*, 253 Ill. App. 3d at 1051-52 (stating that a defendant's refusal to take a breathalyzer test was relevant in a driving under the influence case "because it implies that [the driver] believes he is intoxicated"). Although Riley claims there was no evidence of the "typical indicia of impairment," there was an abundance of strongly corroborated evidence allowing a rational trier of fact to determine that Riley was under the influence of alcohol when he drove into Serrano-Collazo. *Morris*, 2014 IL App (1st) 130512, ¶¶ 21-23 (finding the evidence proved the defendant guilty of aggravated driving under the influence of alcohol beyond a reasonable doubt, where two officers testified that the defendant had bloodshot eyes and smelled strongly of alcohol, and the defendant refused to take a breathalyzer test).

¶ 40     Riley asserts that the State failed to establish that his driving under the influence proximately caused Serrano-Collazo's death. According to Riley, the "uncontroverted evidence" showed that Serrano-Collazo "stepped in front of Mr. Riley's vehicle directly before the collision occurred," and Riley could not stop his vehicle in time. Riley cites no evidence that "uncontroverted[ly]" supports this factual assertion, but references Mellado's testimony that the tire marks on the street swerved away from the curb and back towards it. Yet Mellado only stated the tire marks "[p]ossibly" indicated evasive movement. Moreover, as the trial court observed,

Vargas testified that he was driving at a similar pace as defendant but was still able to stop in time to allow Serrano-Collazo to pass his traffic lane. Mellado also stated there were tire marks beginning just past the crosswalk where Riley struck Serrano-Collazo, proceeding eastward, and arcing away from and toward the curb. Based on this evidence, the trial court could have found that Riley was unable to avoid striking Serrano-Collazo due to his impairment, and due to his impairment, Riley made no evasive movements until the accident occurred.

¶ 41    Regardless of whether Serrano-Collazo's actions were a proximate cause of his own death, however, the State only needed to show that Riley was "*a* proximate cause of the injuries [citation], not the sole and immediate cause of the victim's injuries." (Emphasis in original and internal quotation marked omitted.) *People v. Merritt*, 343 Ill. App. 3d 442, 448 (2003). Vargas testified that he saw Serrano-Collazo cross North carrying a plastic bag and can, saw the vehicle driven by Riley move towards Serrano-Collazo, heard a crash, and saw the plastic bag that Serrano-Collazo carried tangled in the damaged headlight of Riley's vehicle. Mellado likewise saw that the front right section of Riley's vehicle was damaged and contained pieces of a plastic bag. Additionally, Mellado observed blood, gym shoes, and a "partially crushed beer can" in proximity to the scene. Based on this evidence, as well as the officers' many observations indicating Riley's impairment, a rational trier of fact could have found that Riley's impaired driving proximately caused Serrano-Collazo's death. *Id.* (finding the evidence sufficiently showed the defendant's driving under the influence proximately caused the victim's death, where officers testified that the defendant "had difficulty" taking the field-sobriety tests and had "glazed over" eyes and slurred speech, and where other drivers observed the victim around the time of the accident).

¶ 42    To the extent that Riley challenges whether he failed the field sobriety tests, we find this argument is also without merit. The trial court found that the video of the field sobriety tests

showed that Riley needed to support himself, was unsteady, needed help walking, and had glassy eyes. While Riley challenges the conclusions that could have been drawn from this video given Mendez's testimony, he did not include the video in the appellate record. Riley, as the appellant, had the burden of providing a sufficiently complete record on appeal that fully informs the reviewing court of the issues to be resolved. *People v. Moore*, 377 Ill. App. 3d 294, 300 (2007). Where the appellate record is incomplete, we must presume that the trial court's judgment conforms to the law and has a sufficient factual basis. *Id.* Regardless of the video's availability, however, we also note that the sobriety tests were not conducted five hours after the accident. Thus, even if the evidence conclusively showed that Riley passed the tests, a rational trier of fact still could have concluded that Riley was impaired five hours earlier when the accident occurred.

¶ 43 Riley additionally claims the State's witnesses were not credible, as they presented inconsistent testimony. First, Riley asserts that Vargas and Daniel testified inconsistently as to when Riley exited his vehicle, whether he stood over Serrano-Collazo, and who escorted him to the police vehicle. Second, Riley claims Cecchin and Mendez testified that Riley had balancing issues, while Ramos's testimony regarding sobriety test video showed that Riley did not have balancing issues. Third, Riley asserts that Ramos testified that Riley slept in the police station's processing room, while Officer Mendez testified that Riley was in a holding cell and did not sleep. Fourth, Riley claims that the police officers failed to note their opinion that Riley was under the influence in "any of their written reports."

¶ 44 Regardless of these slight differences in testimony, or the substance of the written reports on the accident, as we have stated, the testimony at trial consistently showed that: (1) Riley exited a vehicle parked in proximity to the accident; (2) the vehicle had a dented hood and a dislodged headlight, which contained an entangled plastic bag that Serrano-Collazo was seen carrying before

the accident; (3) Riley smelled strongly of alcohol, walked slowly, and had glassy eyes; and (4) Serrano-Collazo was found with severe injuries at the scene of the accident and died soon after. It was the trial court's role to determine the witnesses' credibility despite any apparent inconsistencies in their accounts, and these insignificant inconsistencies did "not automatically create a reasonable doubt of guilt" (*Corral*, 2019 IL App (1st) 171501, ¶ 85), particularly where the evidence was consistent as to the material factors supporting Riley's conviction. We will not substitute our judgment for that of the trial court as to the trial court's determinations of credibility. *Hardman*, 2017 IL 121453, ¶ 37.

¶ 45 Riley additionally claims that the trial court acted in "complete abandonment" of the requirement that Riley be proven guilty beyond a reasonable doubt by relying on Riley's charging instrument as proof of guilt. Riley refers to the court's statement that "[t]he charge itself shows that it's driving under the influence." However, Riley presents this quote out of context. At trial, Riley elicited testimony in cross-examination that certain officers failed to note in their reports that they believed Riley was under the influence, apparently suggesting that the officers did not think Riley was impaired. The court merely noted Riley's charging instrument as one indication that the officers processed Riley for driving under the influence of alcohol, even if the officers' reports lacked this information. The statement was in response to a theory presented by defense counsel, and there is no indication that the trial court considered the charging instrument as proof of any element supporting Riley's conviction. Because the record does not affirmatively show that the trial court based its judgment on Riley's charging instrument, the court's passing reference to Riley's charges does not merit reversal. *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 261 ("On review of a bench trial, we presume that the trial judge considered only properly admitted evidence unless the record affirmatively rebuts that presumption.").

¶ 46    For these reasons, we will not reverse the trial court's judgment, when the State proved Riley's guilt beyond a reasonable doubt.

¶ 47    II. Reliance on Improper Evidence

¶ 48    Riley next argues that the trial court wrongfully relied on evidence that was not presented at trial when concluding that Riley was impaired.

¶ 49    A trial court's failure to recall and consider testimony crucial to a defendant's defense may constitute a violation of the defendant's due process rights. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). "But if a trial court's 'minor misstatement' of the evidence did not affect the basis of the ruling, it does not violate due process." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39. When reviewing a bench trial, we must presume that the trial court only considered proper evidence unless the record affirmatively shows otherwise. *Oglesby*, 2016 IL App (1st) 141477, ¶ 261. We review *de novo* whether the trial court "made an affirmative mistake in its decision-making process." *People v. Williams*, 2013 IL App (1st) 111116, ¶ 104.

¶ 50    Many of Riley's challenges to the facts allegedly not in evidence essentially amount to factual disputes with the trial court's reasonable inferences. First, Riley claims that the trial court inaccurately recalled testimony that Daniel had to support Riley on his way to the police vehicle because Riley had a difficult time balancing. However, this finding could have reasonably been inferred from Daniel's testimony that Riley had a "slow" and "deliberate" pace when walking, and that Daniel "took hold of [Riley's] arm" and walked him towards the police vehicle.

¶ 51    Second, Riley alleges there was no "positive testimony" that Riley failed to apply his brakes when he struck Serrano-Collazo. Yet Vargas testified that he did not notice Riley reduce speed or "see taillights on" when he observed Riley strike Serrano-Collazo. Further, the testimony at trial showed that the accident occurred at the west crosswalk on North, and Mellado testified

there were tire marks beginning "just east" of that crosswalk. Based on this evidence, the trial court could have reasonably inferred that Riley did not apply his brakes until he struck Serrano-Collazo.

¶ 52    Third, Riley asserts the court inaccurately recalled that Vargas had "full view" of defendant in the truck. Yet this could have been inferred from Vargas's testimony that he saw Riley driving about "a car-and-a-half to two cars" in front of him before the accident occurred. Fourth, Riley asserts that the court inaccurately found that Riley "ran over the body" of Serrano-Collazo, and that "the body [of Serrano-Collazo] went up in the air." Nothing in the record suggests that the phrase "ran over" here was anything more than a mere figure of speech. Moreover, the court could have inferred that Serrano-Collazo's body left the ground based on the evidence that Serrano-Collazo was hit by a truck driving at least 40 miles per hour, and that a pair of gym shoes were found just east of the accident's location. The trial court, as the trier of fact, was entitled to draw these reasonable inferences from the circumstantial and direct evidence at trial. *People v. Herring*, 324 Ill. App. 3d 458, 465 (2001). We will not reverse the trial court for drawing these inferences.

¶ 53    Riley additionally claims that the court incorrectly stated that Riley "sped past" Vargas. While Vargas never testified that Riley drove "past" him, his testimony clearly stated that Riley drove over the speed limit, which was a far more crucial fact. Thus, even if this finding was slightly inaccurate, it would amount to a "minor misstatement" that did not affect the basis of the court's ruling. *Williams*, 2017 IL App (1st) 150795, ¶ 39; see also *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107 (finding the trial court's "minor misstatement had no affect on the basis of the trial court's ruling and did not result in a mistake in the decision-making process," where the trial court mistakenly referred to " 'sutures in the dura,' " even though "sutures are found in the skull").

¶ 54    In some instances, the defense misconstrues the trial court's findings and evidence when claiming that the trial court relied on facts not entered into evidence. For instance, Riley claims

the trial court inaccurately recalled Mellado's testimony. Riley refers to the court's statement that "the investigating officer at the scene" believed that Riley was impaired, and that "a reasonable person would have been able to adjust their speed *** and *** direction of driving as to avoid a human being in the crosswalk." However, it is not clear that the court was even referring to Mellado here. Thus, the record does not affirmatively show the trial court considered anything inaccurate or not in evidence. *Oglesby*, 2016 IL App (1st) 141477, ¶ 261.

¶ 55    Riley also challenges the court's observations regarding the video and photographic evidence. Namely, the trial court found that the video of Riley's field sobriety tests showed Riley was unsteady and needed to support himself. Yet Mendez stated that Riley did not have difficulty maintaining balance during the tests. Based on photographic evidence, the court also found that there was "overhead lighting" at the scene. Riley asserts, however, that this finding was inconsistent with Mellado's testimony that he used flash when taking the photographs. We note that Mellado only stated he had "access" to flash lighting on his camera, and even stated one of the photographs of the scene was taken without flash. Either way, the defense failed to provide the video and photographic evidence in the appellate record, and so we must presume the trial court's findings were consistent with this evidence. *Moore*, 377 Ill. App. 3d at 300.

¶ 56    For these reasons, we will not reverse the judgment of the trial court based on the assertion that the trial court relied on evidence not in the record.

¶ 57    III. Right against Self-Incrimination

¶ 58    Riley last argues that the trial court violated his Fifth Amendment right against self-incrimination, as well as the "no comment rule," by considering his silence in finding he was guilty. The State responds that the trial court expressly stated it did not consider Riley's silence to

determine his guilt. Rather, the court only considered Riley's unresponsive behavior, and the fact that he fell asleep at the police station, as circumstantial evidence that Riley was impaired.

¶ 59    The fifth amendment to the United States Constitution states, "No person *** shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V; see also Ill. Const. 1970, art. I, § 10 ("No person shall be compelled in a criminal case to give evidence against himself ***."). " 'To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled.' " *People v. Haleas*, 404 Ill. App. 3d 668, 672 (2010) (quoting *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*, 542 U.S. 177, 189 (2004)). In determining whether conduct or statements fall under the fifth amendment's protections, the United States Supreme Court has distinguished that the fifth amendment protects a suspect from being compelled by the State to produce testimonial evidence, but not " 'real or physical evidence.' " *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990) (quoting *Schmerber v. California*, 384 U.S. 757, 761-62 (1966)). "[T]o be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." (Internal quotation marks omitted.) *Id.* " '[T]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material.' " *Id.* at 591 (quoting *Holt v. United States*, 218 U.S. 245, 252-53 (1910)).

¶ 60    Here, Riley testified that at the scene of the accident, Riley mumbled "unintelligibl[y]," appeared "catatonic," and "just [stood] there *** looking." Vargas stated that, among other factors, Riley's lack of an intelligible response indicated Riley's impairment. In explaining its findings, the trial court expressly stated it was not considering Riley's "refusal to talk." Rather, the court only considered Riley's actions of "not looking at [Serrano-Collazo], not going to see if something

was okay, and not hurrying and rushing over to them to see they were okay or calling for help" among the several indicators that Riley was impaired. The trial court only considered Riley's lack of physical response and coordination in relation to his surroundings among the circumstantial evidence of his impairment. This evidence was physical, and not testimonial, and therefore did not implicate the fifth amendment. *Muniz*, 496 U.S. at 592 (finding that the defendant's "slurring of speech and other evidence of lack of muscular coordination" when responding to a police officer's question were not testimonial); see also *People v. Bugbee*, 201 Ill. App. 3d 952, 959 (1990) (finding that the defendant's response to an officer's request to recite the alphabet was not testimonial, as "[i]t would reveal nothing more than coordination on his part and would not reveal any subjective knowledge or thought processes which might tend to incriminate him"). Accordingly, the trial court did not violate the fifth amendment in considering this evidence.

¶ 61    We also find that Riley is not protected by what he coins the "no comment rule." Based on the case law cited by Riley, Riley apparently refers to the general principle that "the court and the prosecutor are forbidden from making any direct reference to a defendant's failure to testify." *People v. Hopkins*, 52 Ill. 2d 1, 6 (1972); see also *People v. Burton*, 44 Ill. 2d 53, 56 (1969) (stating that in closing argument, the prosecution may not remark in a manner "intended or calculated" to draw the jury's attention to the defendant's decision not to testify (internal quotation marks omitted)). Riley also cites section 115-16 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115-16 (West 2014)), which provides:

> "A defendant in a criminal case or proceeding shall only at his or her own request be deemed a competent witness, and the person's neglect to testify shall not create a presumption against the person, nor shall the court permit a reference or comment to be made to or upon that neglect."

¶ 62     There is nothing in the record suggesting that the trial court considered Riley's decision not to testify at trial as evidence against Riley, and Riley cites no portion of the record suggesting this occurred. Accordingly, we will not reverse the trial court's judgment based on the assertion that the court considered Riley's silence on the day of the accident as proof of Riley's guilt.

¶ 63     CONCLUSION

¶ 64     For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 65     Affirmed.