# Illinois Official Reports

## Appellate Court

---

*People v. Williams*, 2017 IL App (1st) 150795

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARIUS WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0795 |
| Filed<br>Rehearing denied | September 26, 2017<br>October 19, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-15939; the Hon. Anna Demacopoulos, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Roxanna A. Mason, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Dylan J. Rakestraw, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Neville and Justice Pierce concurred in the judgment and opinion. |

**OPINION**

¶ 1    While riding in a car driven by his cousin, Darius Williams fired a handgun at two cars traveling nearby. At trial, Williams testified that he did so only in self-defense: he did not realize that the other two cars were driven by off-duty police officers, and he fired the handgun after one of those officers fired a gun at his car. The trial court rejected this affirmative defense, convicted Williams of aggravated discharge of a firearm, and sentenced him to 10 years of imprisonment.

¶ 2    Williams first argues that the State did not disprove his self-defense claim beyond a reasonable doubt. But, giving deference to the trier of fact's credibility findings, the State did present enough evidence to do so. Further, any misstatement of the evidence by the trial court in its verdict was so minimal that it did not deprive Williams of due process. The sentence was not excessive. Finally, we reject Williams's claim that the sentencing statutes conflict and require him to be given day-for-day credit against his sentence.

¶ 3                                  BACKGROUND

¶ 4    Williams and his cousin Jeremiah Witcher were both charged with attempted first degree murder and aggravated discharge of a firearm. They were tried separately, and Williams waived his right to a jury trial.

¶ 5    Harvey police officer Leonard Weathers testified that on August 14, 2010, he left the station at 7 a.m. after finishing his shift. He was still wearing his light blue police uniform shirt and dark blue pants, but not his police hat. Weathers got into his personal vehicle, a 2000 Cadillac that had no police markings, and began driving north on the Dixie Highway. As he passed 151st Street, his car was almost struck by a red car turning onto Dixie Highway from 151st Street, and Weathers was forced to swerve into the oncoming lane of traffic to avoid a collision.

¶ 6    Weathers saw two people in the red car, both sitting in front. Weathers attempted to catch up to the red car. Weathers pulled up along the red car's left side, held up his police badge, and signaled at the red car to pull over, but the car continued driving north. Weathers did not exchange words with the driver. Weathers saw the passenger reach under the seat and Weathers slowed down, remaining in the left lane but now behind the red car.

¶ 7    Weathers saw fellow police officer Oshay Rife, driving his own personal vehicle, approaching the red car from the passenger's side. Weathers reached for his cell phone to call Rife and warn him not to pull up alongside the red car, as Weathers did not know what the red car's passenger had been reaching for under the seat. But Weathers did not make the call, because Rife did pull up along the passenger's side of the red car and then Weathers heard a few gunshots. Weathers did not see where the shots came from, but saw Rife's car slow down and move further to the right. Weathers then called 911 and continued following the red car as it drove north on the Dixie Highway and then turned west onto 139th Street. Weathers was still on the phone with the 911 dispatcher, trying to determine his exact location, when the driver of the red car reached his right arm out the driver's side window (across his body) and began firing a handgun. The red car then turned off into a grassy area, Weathers lost track of it for a few seconds, and it was then found empty and parked behind a house.

¶ 8 Weathers did not know how fast he or the red car had been driving, but was sure it was over the speed limit. He never saw any weapon in the passenger's hand. Weathers himself was armed with his duty weapon, a semiautomatic handgun with one magazine (and another two magazines in the trunk of the car). He denied drawing his weapon before the first set of gunshots, pointing the weapon at the red car, or firing it.

¶ 9 Police officers from other jurisdictions arrived. Weathers spoke to Detective Harvey on the scene and told him that the passenger had reached down under the seat. He did not tell Detective Harvey that he had been trying to pull the red car over at the beginning of the encounter. The evidence technician examined Weathers's duty weapon and looked in the trunk; Weathers did not remember whether the technician looked at the extra magazines in the trunk.

¶ 10 Weathers later examined mugshots of potential suspects but was unable to identify either person in the red car.

¶ 11 Oshay Rife also got off duty at 7 a.m. that day, and left the parking lot in his personal vehicle, a Chrysler 300, around the same time as Weathers. Rife was still wearing his blue uniform shirt, but it was open over a white T-shirt. He did not have on his police vest or hat.

¶ 12 Rife also turned onto the Dixie Highway and saw a red car run through a stop sign, turn onto the Dixie Highway, and nearly collide with Weathers's car. Weathers swerved into oncoming traffic. Rife saw Weathers pull up next to the red car, but the red car sped up. Rife then pulled up alongside the passenger side of the red car; he had his police badge in his left hand and made a motion for the red car to pull over while yelling "pull over." Instead, the red car moved to the right and tried to run Rife off the road; Rife had to slow down to avoid hitting the curb, and pulled directly behind the red car. Rife then saw the red car's passenger lean the top half of his body out the window and begin firing a gun. Rife saw the gun and sparks emitting from it. Rife heard more than one shot. Rife tried to evade the shots by maneuvering side to side. He identified Williams as the passenger.

¶ 13 Weathers pulled alongside Rife, and Rife slowed down and signaled to Weathers that he had been fired on. The red car continued north on the Dixie Highway, then turned west on 139th Street. Rife was two car lengths from the red car when he saw the driver put his hand and a firearm out the driver's side window; Rife saw sparks from the gun. Rife and Weathers continued their pursuit but then saw a police officer by the road and stopped to tell him about the shooting. That officer told Rife and Weathers that he could not pursue the red car until instructed by dispatch, so Rife and Weathers continued the pursuit. They saw that the red car had made another left turn, so they followed and found the red car in a backyard, behind a house, with its doors open. Rife told Detective Harvey that the red car had committed a traffic violation and that he could identify the passenger. Later, Rife identified both the passenger and the driver from photographs.

¶ 14 Rife had his service weapon, a Springfield .45, with him, but he denied pointing it at the red car or firing it. He turned the weapon over to the investigators for inspection. There was a magazine inside the weapon but Rife was not sure whether there were two additional magazines in his car trunk. He was not present when his car was examined.

¶ 15 Anthony Harvey of the Dixmoor police department was assigned to investigate the incident. He ran the license plate number on the red car, which led him to a suspect. Rife identified a photograph of Williams as the passenger of the red car. Weathers had told Harvey that the red car was driving at a high rate of speed and that he had signaled the red car to pull

over. Harvey did not remember if Weathers was wearing his police shirt that day. The parties stipulated that Detective Harvey's report did not contain Rife's statements that Rife pulled alongside the red car, signaled the red car to pull over, was able to identify either defendant, or that the red car ran a stop sign.

¶ 16    At about 12:30 p.m. the same day, Williams and another man came to the Harvey police department to report that Williams had been shot at by a machine gun. The desk clerk thought that this might be connected to Rife's and Weathers's incident, so she went to the dispatch area. She identified a photo of Williams as one of the people making the report, so detectives were notified and they placed Williams in custody.

¶ 17    Photographs taken at the scene showed that Rife's car had two "defects" in the driver's side door: one hole through the door, and one that partially penetrated the door. The red car's rear driver's side panel window was broken. There was a spent cartridge casing on the floor, and another one lodged in the rear seat. Both had been fired from the same firearm. There was a circular defect on the cushion of the driver's side rear seat, and a projectile lodged in that defect. The evidence technician opined that, based on the shape of the break in the side panel window, the projectile had been fired from the driver's side window, broken the back window, and then lodged in the rear seat. There was black powder residue on the driver's door immediately in front of the broken glass, but it was not tested for gunshot residue.

¶ 18    The casings inside the red car were .25 caliber, while Weathers's and Rife's duty weapons were .45 caliber. Both duty weapons were loaded to capacity, and the evidence technicians could not determine if they had been fired. Weathers and Rife were not tested for gunshot residue. Both Weathers's and Rife's cars were searched, and technicians did not find any other weapons or any .25-caliber ammunition. The evidence technicians did not recall if Weathers told them he had other magazines in the trunk and did not recall seeing those magazines. The technicians could not know if the defects in the door were preexisting.

¶ 19    Darius Williams testified that his cousin Jeremiah Witcher was driving the red car and Williams was the passenger. Williams was on the phone with a friend when Witcher came to a stop sign by the Dixie Highway. Witcher made a wide turn onto the highway and nearly collided with a white Cadillac. As they drove north, the Cadillac pulled up to the driver's side of Witcher's car, and the driver and Witcher "exchanged a few words," including expletives. Williams looked up and saw the driver of the Cadillac with a black handgun in his hand, so Williams told Witcher to "go." Witcher sped up.

¶ 20    Witcher sped through a red light, and then Williams noticed that they were being followed by a Chrysler 300 as well as the Cadillac. When the Cadillac tried to pull up on the driver's side, Witcher swerved. When the Chrysler tried to pull up on the passenger's side, Witcher swerved again. The driver of the Cadillac fired a gunshot, and Witcher drove erratically, braking and swerving. When one of the cars again pulled up alongside, Witcher fired a gunshot out the driver's side window, then sped up again. The Cadillac and the Chrysler slowed down. Williams heard another shot fired in his direction, but could not tell which car it had come from. Witcher pulled a silver revolver out of the center console and handed it to Williams. Witcher turned left onto 139th Street. The Chrysler tried to pull up along the driver's side, and Witcher again swerved. The Cadillac moved along the passenger's side, and Williams saw a gun in the driver's left hand. The driver lifted the gun, and Williams fired the revolver out the window. As the other cars slowed down, Williams heard two additional shots, but was not sure which driver had fired.

¶ 21 Witcher made another left turn and began driving through a neighborhood; the other cars stopped at the neighborhood's entrance. Williams told Witcher to get them away from there, but the car stalled after Witcher made a sharp turn and the car spun out. Williams and Witcher ran.

¶ 22 Williams called his father to tell him about the incident and went to the police station to report it. He was arrested there. Williams did not see the other drivers wearing police uniforms or police badges, and they never announced themselves as police. Williams maintained that he had not known the other drivers were police officers, that they fired at him first, and that he was in fear for his life when he fired back.

¶ 23 The trial court acquitted Williams of attempted murder, but convicted him of aggravated discharge of a firearm. The court noted: "It basically comes down to a question of credibility. Do I believe what Officer Weathers and Officer Rife say happened that morning, or do I believe what Mr. Williams said that morning? So this Court has to look at the physical evidence that is involved here. The physical evidence that I have is documented in the photographs. All of the photographs corroborate the manner in which Officer Weathers and Officer Rife indicate happened that day. I cannot believe that two police officers would miss their target, yet two individuals with two separate guns hit their target. So I do find that the officers' version of the events that happened that morning more credible than that of Mr. Williams."

¶ 24 Williams's counsel filed a posttrial motion alleging that the evidence had not proved Williams guilty beyond a reasonable doubt. The trial court denied the motion.

¶ 25 The sentencing range for aggravated discharge of a firearm was 4 to 15 years. The presentence investigation report reflected that Williams was 20 years old at the time of the incident, an employed high school graduate. He had been arrested twice as a juvenile, but neither case went to court, and he had no adult arrests or convictions. He had no history of substance abuse or gang affiliation. He had a good relationship with both parents, and his father expressed concern and support for him during the case. Before trial, Williams was released on bond. He was arrested again in 2012 for armed violence, and his bail was revoked.

¶ 26 The State argued several aggravating factors, including that the shooting was directed at an occupied vehicle, it endangered other drivers, there was a threat of bodily harm, and a harsh sentence was needed for deterrence. Williams's counsel asked for the minimum sentence, arguing that Williams had no other criminal background, had a strong family relationship, had been continuously employed, and had behaved well in custody. He also argued that the officers were not in full uniform, the argument had been started by Weathers, and the officers' car trunks had not been thoroughly searched. In allocution, Williams apologized for his actions and stated that he had reacted out of shock and fear.

¶ 27 The trial court sentenced Williams to 10 years of imprisonment. The court noted the mitigating factors of Williams's age, potential for rehabilitation, and good behavior during incarceration. But the court also noted aggravating factors, including the danger to the community, the potential to cause great bodily harm, and "in this case *** the facts themselves." The court also cited deterrence as an aggravating factor: "you just can't be shooting out there."

¶ 28 Williams's counsel did not move to reconsider the sentence. Williams filed a timely notice of appeal.

ANALYSIS

The State Disproved Williams's Self-Defense Claim

Williams first argues that the State did not disprove that he acted in self-defense. When a defendant raises self-defense as an affirmative defense, the burden shifts to the State to disprove it beyond a reasonable doubt. *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004). The elements of self-defense are (i) an unlawful force threatened against a person, (ii) the person threatened not being the aggressor, (iii) the imminent danger of harm, (iv) the necessary use of force, (v) the threatened person's actual and subjective belief of danger requiring the use of the force, and (vi) the objectively reasonable beliefs of the threatened person. *Id.* at 225. If the State negates any one of these elements, the defendant's claim of self-defense fails. *Id.*

Williams alleges that the State failed to disprove any one of these elements. On appeal, he analyzes the question through three different factual scenarios: first, that his use of force was justified because at least one of the officers actually fired a gun (as he testified at trial); second, that he was justified even if the officers did not actually fire their guns because he knew the officers were "armed"; and third, that he was justified (even without reference to the officers' guns) due to their aggressive driving behavior.

The first two of these scenarios come down to questions of credibility. Both officers testified that they never fired their guns at the red car, or even pointed their guns at that car. If the trier of fact credited that testimony over Williams's, then this would negate several elements of the self-defense claim (that unlawful force was threatened against Williams, the danger of harm was imminent, the use of force was necessary, Williams actually and subjectively believed the danger existed, and his beliefs were objectively reasonable). See *People v. Evans*, 209 Ill. 2d 194, 211 (2004) (trier of fact assesses credibility of witnesses, determines appropriate weight to give testimony, and resolves inconsistencies in evidence).

The third scenario is a closer question, because it was undisputed among Williams, Rife, and Weathers that the two officers chased after the red car at a high rate of speed and repeatedly tried to pull up alongside the red car. This type of driving behavior could constitute an imminent danger of harm from a car crash, and it is credible that Williams could have reasonably believed that he was in danger for his life. But it does not necessarily support the other elements of self-defense. Most importantly, the State's evidence disproved that Williams's use of force (firing a gun at a moving vehicle while driving on the public roads) was necessary to protect himself from being pursued by two other cars. Aggressive driving does not justify shooting.

Plain Error

Williams next argues that the trial court erred in basing its verdict on a misapprehension of facts and in giving him an excessive sentence. He acknowledges that his trial counsel failed to preserve these errors; nevertheless, he argues they merit reversal under the plain error doctrine. The burden falls to Williams to show a clear or obvious error occurred and either (i) the evidence is so closely balanced that the error, standing alone, threatened to tip the scales against him regardless of the seriousness of the error or (ii) the error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 37                    The Trial Court's Verdict Did Not Violate Due Process

¶ 38        First, Williams argues that the trial court's explanation of its verdict shows that it based the verdict on a misapprehension of the firearm-related evidence. In finding Williams guilty, the trial court noted that it was a credibility contest between Williams versus the officers, but found the officers more credible because their version of events was corroborated by the physical evidence documented in the photographs. The trial court added, "I cannot believe that two police officers would miss their target, yet two individuals with two separate guns hit their target." Williams argues that this was an inaccurate statement of the evidence, since there was no evidence that both Williams and Witcher hit Rife's car, it assumed that Williams, Rife, and Witcher were all firing in the same conditions, and it assumed that Rife and Weathers, as police officers, had better aim than Williams and Witcher.

¶ 39        A trial court's failure to recall and consider testimony that is crucial to the defense may violate the defendant's right to due process. *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). If the record affirmatively shows that the trial court did not remember the "crux" of the defense, the defendant did not receive a fair trial. *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91. But, if a trial court's "minor misstatement" of the evidence did not affect the basis of the ruling, it does not violate due process. *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107.

¶ 40        We agree with the State that the trial court's statement regarding the physical evidence (the bullet holes in the door of Rife's car) did not bear on the "crux" of Williams's defense. *Simon*, 2011 IL App (1st) 091197, ¶ 91. Regardless of whether Williams (or Witcher, or both) successfully hit Rife's car, whether all the men were firing in the same conditions, and whether Rife and Weathers had better aim, Williams admitted firing a gun at Rife. And the only physical evidence that the red car had been fired on were the .25-caliber casings found lodged in its backseat—consistent with the testimony from Weathers, Rife, and Williams that Witcher fired across his body out the driver's side window, and inconsistent with Weathers's and Rife's .45-caliber weapons. The physical evidence exposed the biggest weakness of Williams's self-defense claim: no evidence, except his testimony, that either officer ever fired (or even pointed a gun) at the red car. Which of the four men would have had the best aim was not the crucial issue. There was no error, let alone "plain" error, and so we need not go further in the plain error analysis.


¶ 41                              The Sentence Was Not Excessive

¶ 42        Williams argues that his sentence was excessive. Specifically, he argues that his background and potential for rehabilitation justified a lower sentence, the facts supporting his self-defense claim tended to excuse or justify his conduct, and the trial court improperly relied on a factor inherent in the offense while sentencing him (that he had fired a weapon). He acknowledges that we can review the claim only for plain error, but alternatively argues that his trial counsel was ineffective for failing to preserve the error. Before we can view the claim through either lens, we must determine whether any error occurred.

¶ 43        It has long been settled law that a reviewing court may not reverse the sentencing court just because the reviewing court may have differently weighed the relevant factors. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 44    All sentences must reflect the seriousness of the offense committed and the objective of rehabilitating offenders to useful citizenship. *People v. Cooper*, 283 Ill. App. 3d 86, 95 (1996). The most important factor to consider is the seriousness of the crime. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 123; *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007). The trial court considers all factors in mitigation and aggravation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). We presume a trial court evaluates the relevant factors in mitigation before it, and that presumption cannot be overcome without affirmative evidence of the sentencing court's failure to do so. *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Nothing requires the trial court set forth every reason or specify the weight it gave to each factor when determining the sentence. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 227.

¶ 45    The presentence report does indicate that Williams had a strong family background, no previous adult criminal record, and potential for rehabilitation. Williams's counsel noted these facts while arguing for a low sentence and the trial court did as well while explaining its decision. We discern no reason to reweigh these factors on appeal. *Streit*, 142 Ill. 2d at 19.

¶ 46    The same applies to the claim that Williams's actions were justified or excused by the odd factual scenario. Williams did indeed argue, both through his own testimony and his counsel's cross-examination, that he shot at the officers only because he feared for his life. But we presume that the trial court considered relevant mitigating evidence, absent some indication to the contrary. *People v. Dominguez*, 255 Ill. App. 3d 995, 1004 (1994). Nor does the record suggest that the trial court ignored Williams's argument, which was the crux of his defense. Further, the trial court did not need to set forth every reason for its decision or specify the weight (or non-weight) given to this particular factor. *Burgess*, 2015 IL App (1st) 130657, ¶ 227.

¶ 47    Finally, Williams argues that the trial court "double-counted" his firing a weapon at the officers, both as an element of aggravated discharge of a firearm and as an aggravating factor. But Williams misreads the trial court's reasoning. In enumerating aggravating factors, the trial court stated: "The biggest factor that this Court takes into consideration is the deterrent factor. You just can't be shooting out there. At some point in time the message has to come, and that is the only mechanism that we have in the criminal justice system is through our sentences." The trial court did not double-count the act of Williams firing the gun; instead, it aggravated Williams's sentence specifically to deter others from repeating Williams's action. Williams does not suggest that deterrence itself is an improper aggravating factor.

¶ 48    Williams has not demonstrated plain error, or that trial counsel's performance was deficient in failing to file a non-meritorious motion.

¶ 49                   Williams Must Serve at Least 85% of His Sentence

¶ 50    Finally, Williams argues that there is a conflict between two sections of the sentencing statute governing whether he will receive day-for-day credit against his sentence (allowing him to serve as little as 50% of his sentence) or must serve at least 85% of his sentence. Because of this conflict, he argues, he must be given the day-for-day credit.

¶ 51    The statute is section 3-6-3 of the Unified Code of Corrections (730 ILCS 5/3-6-3(a)(2) (West 2012)). In relevant part, it states:

    "[W]ith respect to offenses listed in clause *** (iii) of this paragraph *** committed on or after June 19, 1998 or with respect to the offense listed in clause (iv) of this

paragraph *** committed on or after June 23, 2005 (the effective date of Public Act 94-71) ***:

* * *

(iii) that a prisoner serving a sentence for *** aggravated discharge of a firearm, *** when the court has made and entered a finding, *** that the conduct leading to conviction for the enumerated offense resulted in great bodily harm to a victim, shall receive no more than 4.5 days of sentence credit for each month of his or her sentence of imprisonment;

(iv) that a prisoner serving a sentence for aggravated discharge of a firearm, whether or not the conduct leading to conviction for the offense resulted in great bodily harm to the victim, shall receive no more than 4.5 days of sentence credit for each month of his or her sentence of imprisonment." *Id.*

¶ 52    If clause (iii) applies to Williams, then he would receive day-for-day credit (the default position) unless the trial court specifically found that his conduct resulted in great bodily harm, in which case he would only receive a maximum of 4.5 days of credit per month (requiring him to serve at least 85% of his sentence). If clause (iv) applied, then he could not receive day-for-day credit (and would need to serve at least 85% of his sentence) regardless of whether the trial court made the finding. Williams argues that because he committed his crime in 2010, after both of the effective dates listed in paragraph (2), the clauses conflict with each other and he should receive the benefit under the "rule of lenity."

¶ 53    But following the tenets of statutory interpretation, we are not convinced that these clauses conflict. Our object in construing the statute is to give effect to legislative intent, and we presume the legislature did not intend absurd results. *People v. Lewis*, 234 Ill. 2d 32, 44 (2009). Williams's interpretation would require us to read the statute as though the legislature meant to contradict itself within one sentence.

¶ 54    Rather, it seems that the legislature intended, by including these two effective dates, that the penalties for aggravated discharge of a firearm should change depending on when they were committed. If the crime was committed between June 19, 1998, and June 22, 2005, then clause (iii) would apply, and the defendant could receive day-for-day credit unless the trial court made the necessary finding. But the penalty became more severe starting on June 23, 2005, and there would be no day-for-day credit regardless of whether the conduct resulted in great bodily harm. Our interpretation of the statute's plain language is consistent with *People v. Williams*, 2015 IL App (1st) 130097, ¶ 63, where the defendant raised the same argument. The *Williams* court rejected it, noting that the language indicated that the legislature "deemed this offense to be of such a serious nature, that it sought to enhance the time served provision regardless of bodily harm to a victim." *Id.* We agree and reject this claim.

¶ 55    We affirm Williams's conviction and sentence.

¶ 56    Affirmed.