2020 IL App (1st) 170663-U
No. 1-17-0663
Order filed June 15, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 8009 |
| | ) | |
| VERINICA TOLLIVER, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Justices Pierce and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for aggravated driving under the influence of alcohol, where (i) the State's evidence was sufficient to prove beyond a reasonable doubt that defendant was intoxicated; and (ii) none of the trial court's alleged misstatements of the evidence resulted in a violation of her due process right to a fair trial.

¶ 2    After a bench trial, Verinica Tolliver was convicted of aggravated driving under the influence of alcohol and sentenced to three years' imprisonment. On appeal, Tolliver contends that (i) the State's evidence was insufficient to prove her guilty beyond a reasonable doubt and (ii) the trial judge's "misrecollection of evidence" denied her due process right to a fair trial.

¶ 3    We affirm. Viewing the evidence in the light most favorable to the State, the evidence was sufficient for the trial court to find beyond a reasonable doubt that Tolliver was under the influence of alcohol, And, we do not find a violation of due process stemming from any of the trial court's alleged "mis-recollections" of the evidence.

¶ 4                          Background

¶ 5    After a May 20, 2016 traffic stop, Tolliver was charged by information with four counts of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(a)(2), (d) (West 2016)). Specifically, count 1 alleged that she drove a motor vehicle while under the influence of alcohol in violation of section 11-501(a)(2) of the Vehicle Code and that the State sought to sentence her "as a class 2 offender pursuant to section 11-501(d)(1)(A)/2(B), in that she has committed two previous violations of * * * section 11-501(a), or a similar provision." Count 2 alleged that she drove while under the influence of alcohol in violation of section 11-501(a)(2) and that the State sought to sentence her "as a Class 4 offender pursuant to section 11-501(d)(1)(G), in that she committed a violation of section 11-501(a) during a period in which [her] driving privileges were revoked, where the revocation was for a violation of * * * section 11-501(a) * * * or a similar provision." Count 3 alleged that she drove while under the influence of alcohol in violation of section 11-501(a)(2) and that the State sought to sentence her "as a Class 4 offender pursuant to section 11-501(d)(1)(G), in that she committed a violation of section 11-501(a) during a period in which her driving privileges were suspended." Count 4 alleged that she drove while under the influence of alcohol while she did not possess a driver's license or permit, "in violation of * * * section 11-501(a)(2)/(d)(1)(H)" of the Vehicle Code.

¶ 6    Tolliver was also charged with two counts of felony driving with a revoked or suspended driver's license (625 ILCS 5/6-303(a) (West 2016)).

¶ 7    At Tolliver's bench trial, the State called two witnesses. Chicago police officer Jessie Rodriguez testified that about 9:40 p.m. on May 20, 2016, he was working as the "point man" at a "road side safety check" near the intersection of 64th Street and Ashland Avenue. Rodriguez explained that the police were stopping "one in five cars" and then "corral[led] them into an interview area where there are officers waiting to interview the driver of the vehicle." He stopped Tolliver's vehicle and asked her for her driver's license. After she said that she did not have a license, he directed her to an area so another officer could further interview her. Rodriguez had no further contact with Tolliver.

¶ 8    On cross-examination, Rodriguez acknowledged that when Tolliver approached the checkpoint, she did not "weave" or hit any cones on the side of the road. He also acknowledged that she was stopped only because the police were stopping one out of every five cars at the checkpoint.

¶ 9    Chicago police officer Jeffrey Curia testified that he had been trained in administering field sobriety tests. On May 20, he was working as an "interviewing officer" at the roadside safety checkpoint. He recalled approaching the driver's side of Tolliver's car and asking for her license. Tolliver said that she was "working on her license" and that she had tickets. During this initial "brief" conversation, Curia obtained Tolliver's name and date of birth. Curia then conducted a LEADS (Law Enforcement Agencies Data System) inquiry of Tolliver. After running the LEADS inquiry, he had a "longer conversation" with her. At that time, he "noticed a

strong odor of an alcoholic beverage coming from her breath." He also noticed that her speech was "slurred and mumbled" and that her eyes were "red, glossy, and bloodshot."

¶ 10    Curia asked Tolliver to step out of her car. He asked her to submit to field sobriety tests, and she agreed. Tolliver answered negatively when Curia asked her if she had anything wrong with her eyes or legs that would prevent her from performing the tests. Curia directed Tolliver to a "smooth and level sidewalk" to administer the tests.

¶ 11    Curia proceeded to explain the horizontal gaze nystagmus (HGN) test to Tolliver. He displayed a ballpoint pen and told her to follow the tip of the pen only with her eyes without moving her head. Curia was unable to get an accurate assessment from the HGN test because Tolliver moved her head a few times and was unable to follow instructions.

¶ 12    Next, Curia asked Tolliver to perform the walk-and-turn test. He explained:

> "For the Walk-and-Turn Test there was no actual line there. So I advised her that there is an imaginary line, and I asked her to put her right foot in front of her left foot and stay there keeping her hands to the sides. Then I did the same, and I demonstrated to her take nine heel to toe steps forward, turn after the nine steps taking small steps and take nine heel to toe steps backwards."

¶ 13    When Tolliver performed the walk-and-turn test, Curia observed several "clues of impairment." Tolliver could not maintain balance while listening to instructions. She also stepped off the imaginary line, and Curia had to advise her to place her right foot back in front of her left foot. Tolliver also "stopped to steady herself while walking" and "did not touch heel to toe," although Curia was not sure how many times she did not do so. Tolliver lost her balance while walking, which caused her to step off the line. After Tolliver completed the nine steps

going forward, she "turned incorrectly." Curia did not remember how many times Tolliver lost her balance during the walk-and-turn test, or how many times she stopped to steady herself.

¶ 14    Curia also asked Tolliver to submit to the one-leg stand test. He told her to lift one of her feet and to keep it "[a]pproximately six inches off the ground looking at the tip of her toe counting out loud one 1,000, two 1,000, three 1,000" until he told her to stop. He also instructed her to keep her arms at her sides. During the test, Curia observed two clues of impairment. First, Tolliver raised her arms to help her maintain balance. Second, she placed her foot down during the test, although Curia was not sure how many times she did so.

¶ 15    After he administered the one-leg stand test, Curia asked a female officer to attempt to conduct a HGN test to see if Tolliver "would cooperate a little bit better with" the other officer. But, Tolliver did not complete that test with the other officer because she was unable to follow directions. Curia again asked Tolliver to perform the one-leg stand test, but Tolliver again used her arms to help maintain balance and placed her foot down. Although Curia wanted to record the tests, he could not find a police vehicle with the proper video equipment.

¶ 16    Curia testified that, based on his observations, he believed that Tolliver was under the influence of alcohol. He placed Tolliver in custody and brought her to the police station. After an observation period of at least 20 minutes, he asked Tolliver to submit to a breathalyzer test. Curia instructed Tolliver to blow into the mouthpiece, and he demonstrated how to do so. Tolliver did not follow the instructions but "suck[ed] into" the mouthpiece and refused to blow inside of it.

¶ 17    Curia read Tolliver her *Miranda* rights after which she agreed to speak with him. During their conversation, Tolliver was "riled up and just randomly saying all kinds of things." She

made a number of statements that were unresponsive to Curia's questions, including telling him that she was going to "sell her p***y to get her car out of the pound."

¶ 18    On cross-examination, Curia acknowledged that he did not see Tolliver drive erratically. He also acknowledged that he did not detect the odor of alcohol during his "very brief" initial conversation, but then noticed it during the second conversation. He agreed that Tolliver was cooperative and non-combative. Curia recalled that Tolliver was wearing boots, but he did not remember if they were high heel boots. Curia was not sure how many times Tolliver stepped off the imaginary line during the walk-and-turn test. He could not remember how many times she raised her arms to help her balance or how many times she put her foot down during the one-leg stand test. Curia acknowledged that no breath, urine or blood samples were collected, and that Tolliver denied that she had been drinking.

¶ 19    The State also introduced into evidence People's Exhibit No. 1, a certified driving abstract for Tolliver, which was admitted without objection. Tolliver's driving abstract reflected that she had two prior convictions from 2011 and 2013 for aggravated driving under the influence of alcohol, and that her license was revoked as of May 20, 2016.

¶ 20    During closing argument, defense counsel acknowledged that Tolliver was driving without a license on the night of her arrest, but contended that there was insufficient evidence that she was under the influence of alcohol.

¶ 21    In finding Tolliver guilty on all charged counts, the court stated the following:

> "The Court heard the evidence. This was a roadside safety check that was being conducted. There was nothing about [defendant's] driving that attracted the officer's attention, she did not have identification. She was asked to go to a

staging area. Another officer encountered her. She did have indicia of having been drinking, odor of alcohol on her breath. She said some really bizarre things that were hardly responsive to questions that were asked of her.

There was [sic] indications on the horizontal gaze nystagmus test that she had been drinking. The other tests she seemed not able to perform, and then she didn't take a Breathalyzer test.

I'm looking at all the evidence in totality - - and she was revoked clearly at that time. I believe that if you look at all of her behavior together, the Government has met their burden of proof beyond a reasonable doubt. She's guilty as charged."

¶ 22    Tolliver's motion for a new trial was denied. The court ordered a presentence investigative report, which reflected Tolliver's two prior convictions for aggravated driving under the influence of alcohol in 2011 and 2013, as well as a 2009 conviction for battery and a 2005 conviction for aggravated battery of a peace officer. On February 24, 2017, the court sentenced Tolliver to three years on count 1 for the offense of aggravated driving under the influence of alcohol. The record reflects that the remaining convictions on counts 2 through 6 were merged into count 1. The same day she filed a notice of appeal.

¶ 23                                        Analysis

¶ 24                        *Sufficiency of Proof Beyond a Reasonable Doubt*

¶ 25    Tolliver first contends that the State's evidence was insufficient to prove beyond a reasonable doubt that she was impaired due to alcohol, as necessary to find her guilty of

aggravated driving under the influence of alcohol. On that basis, she requests that this court reduce her conviction to the lesser offense of driving with a revoked license.

¶ 26    "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the *essential elements* of the crime beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). "A reviewing court must give the State the benefit of all reasonable inferences. [Citations.] *People v. Kiertowicz*, 2013 IL App (1st) 123271, ¶ 19.

¶ 27    In a bench trial, "it is for the trial judge, sitting as the trier of fact, to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 235, 213, 228 (2009). "The reviewing court will not retry the defendant or substitute its judgment for that of the trier of fact on questions involving the weight of the evidence, conflicts in the testimony, or the credibility of witnesses. [Citation.]" *People v. Corral*, 2019 IL App (1st) 171501, ¶ 71. "[T]he fact finder's decision to accept testimony is entitled to great deference but is not conclusive and does not bind the reviewing court. [Citation.] Only where the evidence is so improbable or unsatisfactory as to create reasonable doubt of the defendant's guilt will a conviction be set aside. [Citation.]" *Id.* ¶ 72. "Testimony may be found insufficient to convict only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. [Citation.]" *Kiertowicz*, 2013 IL App (1st) 123271, ¶ 19.

¶ 28    Section 11-501(a) of the Vehicle Code describes the circumstances under which one commits the misdemeanor offense of driving under the influence. 625 ILCS 5/11-501(a) (West

2016). Section 11-501(d) describes the circumstances in which a violation of section 11-501(a) is elevated to aggravated DUI. 625 ILCS 5/11-501(d) (West 2016); *People v. Martin*, 2011 IL 109102, ¶ 14 ("Aggravated DUI occurs when an individual commits some form of misdemeanor DUI, in violation of paragraph (a), and other circumstances are present."). Thus, to prove the defendant committed aggravated DUI, the State must initially establish that the defendant committed misdemeanor DUI. *Id.*

¶ 29　The single aggravated DUI count on which Tolliver was sentenced (count 1) was premised, in part, on violation of section 11-501(a)(2), which provides that a person commits the offense of DUI if he or she is driving or in "actual physical control" of a vehicle while "under the influence of alcohol." 625 ILCS 5/11-501(a)(2) (West 2016). So to prove Tolliver's guilt of aggravated DUI, the State had to first establish Tolliver's actual physical control of the car while under the influence of alcohol. Tolliver does not dispute the circumstances that elevated the offense to aggravated DUI, that is, that she had two or more prior violations of subsection 11-501(a), as reflected by her certified driving abstract. Tolliver also acknowledges that "[t]here was no question at trial that [she] was driving." Thus, the sole issue is whether the State proved that Tolliver was impaired due to the influence of alcohol.

¶ 30　" ' A person is under the influence of alcohol when, as a result of drinking any amount of alcohol, his [or her] mental or physical faculties are so impaired as to reduce his [or her] ability to think and act with ordinary care.' " *People v. Morris*, 2014 IL App (1st) 130512, ¶ 20 (quoting Illinois Pattern Jury Instructions, Criminal, No. 23.29 (4th ed. 2000)). "[T]he prosecution must establish that the defendant was under the influence of a drug or alcohol to a degree that renders him or her incapable of driving safely. [Citation.] Circumstantial evidence alone may suffice to

prove a defendant guilty of DUI. [Citation.]" *Id*. "Where the arresting officer provides credible testimony, scientific proof of intoxication is unnecessary. [Citation.] Specifically, testimony that a defendant's breath smelled of alcohol and his or her eyes were glassy and bloodshot is relevant and admissible evidence in a DUI prosecution." *Id.* A single, credible police officer's testimony may sustain a conviction for DUI. *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 18.

¶ 31    In challenging the sufficiency of the evidence, Tolliver points out that there was no evidence that she was driving erratically, and that she was stopped only because police were stopping one in every five cars at the roadside checkpoint. She further asserts that Curia's testimony "lacked credibility," and that "the evidence is insufficient to show that the [field sobriety] tests were performed properly so as to generate valid and probative results."

¶ 32    After reviewing the evidence in the light most favorable to the State, we find that a rational trier of fact could have concluded that Tolliver was under the influence of alcohol. The record includes Curia's testimony that Tolliver's breath smelled of alcohol; her eyes were bloodshot and her speech was slurred; she could not follow instructions to complete the HGN test; she showed several signs of intoxication on the walk-and-turn and one-leg stand tests; she could not complete a breathalyzer test, and she otherwise made bizarre statements. This evidence and the reasonable inferences from it sufficiently sustains Tolliver's conviction for aggravated DUI. *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 59 (evidence sufficient where it included testimony that defendant used "slurred speech," eyes were " 'glassy and red,' " and officer smelled alcohol on breath). Stated differently, we cannot say that the evidence of intoxication was so improbable or unsatisfactory that no reasonable fact finder could find her guilty beyond a reasonable doubt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 72.

¶ 33 In reaching this conclusion, we consider but reject each of Tolliver's arguments challenging the sufficiency of the evidence.

¶ 34 First, although we acknowledge that there was no testimony that Tolliver was driving erratically, Tolliver has cited no case (and we are aware of none) suggesting a requirement of this kind of evidence to prove her guilty of DUI. Rather, the inquiry concerns whether defendant was under the influence of alcohol to a degree that renders her incapable of driving safely, which can be established by "circumstantial evidence alone." *Morris*, 2014 IL App (1st) 130512, ¶ 20.

¶ 35 Second, Tolliver questions the credibility of Curia's testimony that, although he did not notice anything unusual during his initial brief encounter, he later noticed a strong odor of alcohol, observed her eyes to be red, bloodshot, and glossy, and detected that her speech was slurred. She questions the validity of his observations and suggests that, even if true, they "established little more than that [defendant] * * * may have had a drink and may have been tired or suffering from allergies."

¶ 36 In questioning the validity of Curia's observations, Tolliver essentially invites this court to reweigh the testimony and make new credibility determinations, which we cannot do. *Corral*, 2019 IL App (1st) 171501, ¶ 71. The trial court, sitting as finder of fact, was entitled to find Curia credible when he described signs of Tolliver's intoxication including the smell of alcohol on her breath, the appearance of her eyes, and her slurred speech.

¶ 37 Tolliver also attacks the validity of the field sobriety tests. Tolliver claims that Curia failed to perform any of the three field tests correctly, in compliance with the standards set forth by the National Highway Traffic Safety Administration. With respect to the HGN test, she avers that Curia should have first "examine[d] her eyes for pupil size" and checked her for "resting

nystagamus" before he attempted her to follow a pen with her eyes. She otherwise argues that the HGN "generated no results" and provided no evidence of impairment.

¶ 38    With respect to the walk-and-turn test, she faults Curia for not permitting her to remove her shoes, noting that he did not recall whether she was wearing high heels. She also argues that he should not have directed her to walk along an "imaginary line" rather than an actual line. She emphasizes that Curia could not recall precisely how many times she stepped off the line, how many times she stopped walking, how many times she failed to touch heel to toe, or how far apart her heel was from her toe. Similarly, with respect to the one-leg stand test, she criticizes Curia for not allowing her to first remove her boots; failing to specify "how long he had [defendant] perform the test"; and failing to record how many times she put her foot down or raised her arms to keep her balance. She also points out that he did not testify to "when during the test she exhibited these clues" of impairment, suggesting that she may have "only exhibited these clues after the 30 second time limit on this test had expired." And Curia did not record any of the tests.

¶ 39    "Whether a field-sobriety test was performed correctly goes to the test's admissibility." *State v. Eagletail*, 2014 IL App (1st) 130252, ¶ 39. But, Tolliver does not challenge the admissibility of the field sobriety tests. Rather, she claims that they lack probative value because Curia failed to properly administer them. Thus, her contentions attack the weight of the evidence, and do not preclude the trial court from crediting Curia's testimony about the test results. See *Phillips*, 2015 IL App (1st) 131147, ¶ 24 ("because Phillips does not challenge the admissibility of the HGN test on appeal, but rather its probative value, his challenge goes to the weight accorded to this evidence, which is a factual determination reserved for the trier of fact.

[Citation.]"). The weight of the evidence involves a matter for the trier of fact to resolve, and a reviewing court will not substitute its judgment by reweighing the evidence. *Corral*, 2019 IL App (1st) 171501, ¶ 71. Defense counsel cross-examined Curia on numerous aspects of the field sobriety tests. The trial court was free to give the testimony less weight based on any of the points raised by Tolliver. We decline Tolliver's invitation to reweigh that testimony.

¶ 40    Further, even assuming that the field sobriety tests were performed incorrectly, the trial court could still find Tolliver guilty based on Curia's ample other testimony regarding Tolliver's signs of intoxication. We have upheld a DUI conviction where, as here, independent officer testimony described signs of intoxication. *Groebe*, 2019 IL App (1st) 180503, ¶ 60. "Although the failure of a field sobriety test can be one factor indicating impairment, a finding of impairment can rest * * * solely on the officer's testimony. [Citations.] Therefore, even if this court does not consider the results of the field sobriety tests, the remaining evidence is sufficient to support defendant's conviction." *Id.*; see also *Eagletail*, 2014 IL App (1st) 130252, ¶ 39 ("Even if true that the tests were performed incorrectly, and admitted in error, it was harmless because the testimony of [police officers] present sufficient evidence to prove Eagletail was intoxicated.").

¶ 41    Apart from any mention of the field sobriety tests, Curia testified that he detected a strong odor of alcohol on Tolliver's breath, that her eyes were "red, glossy and bloodshot" and that she slurred her speech. All of this testimony can serve as evidence of intoxication. See, e.g., *Groebe*, 2019 IL App (1st) 180503, ¶ 59 (evidence sufficient where testimony included that defendant used "slurred speech," had " 'glassy and red,' " eyes, and breath smelled of alcohol); *Love*, 2013 IL App (3d) 120113, ¶ 35 (same).

¶ 42    Curia also testified that Tolliver failed to comply with a breathalyzer test, which the trial court could construe as "circumstantial evidence of consciousness of guilt." *Groebe*, 2019 IL App (1st) 180503, ¶ 59; *Morris*, 2014 IL App (1st) 130512, ¶ 20 ("A defendant's refusal to submit to chemical testing shows a consciousness of guilt."). Further, the trial court could find that evidence of Tolliver's bizarre statements in response to police questioning corroborated the signs of intoxication. See *Love*, 2013 IL App (3d) 120113, ¶ 36 (testimony that defendant "exhibited unusual behavior" while transported to hospital supported jury's finding of intoxication). In short, regardless of any alleged faults in the manner in which the field sobriety tests were administered, ample additional evidence, viewed in the light most favorable to the State, is sufficient for the court to conclude that Tolliver was under the influence of alcohol.

¶ 43    In reaching this conclusion, we reject Tolliver's reliance on *People v. Day*, 2016 IL App (3d) 150852 and *People v. Motzko*, 2017 IL App (3d) 160154. Those cases discussed improprieties in the administration of field sobriety tests, in the course of determining that police lacked probable cause to arrest a defendant for DUI. Tolliver suggests that the cases support her claim that Curia's failure to properly administer field sobriety tests undermines the sufficiency of the State's evidence of intoxication. But, given the different standard of review regarding probable cause determinations, *Day* and *Motzko* do not support Tolliver's challenge to the sufficiency of the evidence. The distinction was explained in *People v. Tatera*, 2018 IL App (2d) 160207:

> "[o]n a motion to suppress, the trial court's factual determinations are reviewed to determine whether they are against the manifest weight of the evidence, while the ultimate determination is *de novo*. [Citation.] Thus, the trial court's factual

determinations on a motion to suppress are accorded significant deference; by contrast, here, the evidence is viewed in the light most favorable to the prosecution. In other words, the presumption in a sufficiency-of-the-evidence case favors the State; in a manifest-weight case, it favors the trial court's factual determinations. * * * Thus, the differing standards of review make illogical defendant's claim that, if there is no probable cause, then the evidence cannot be sufficient to convict." *Id.* ¶ 37.

¶ 44 For the same reason, we are not persuaded by Tolliver's reliance on cases deciding whether police had probable cause to arrest. Rather, under the relevant inquiry, we conclude that, viewing the evidence in the light most favorable to the State, the evidence was sufficient for the court to find beyond a reasonable doubt that Tolliver was under the influence of alcohol.

¶ 45 *Trial Court's 'Mis-recollection' of Evidence*

¶ 46 Tolliver next contends that she was deprived of her right to a fair trial because her conviction was based on the trial court's "mis-recollection" of the evidence. Parsing the trial court's statements in finding her guilty, Tolliver posits three ways in which the trial court misconstrued the evidence. First, she takes issue with the statement that "[t]here was [sic] indications on the horizontal gaze nystagmus test that she had been drinking." Tolliver points out that, there were "no results" from the HGN test and contends that the judge's statement "was entirely incorrect." She urges this as prejudicial because the HGN test is "the most reliable" of the field sobriety tests.

¶ 47 Second, Tolliver takes issue with the statement that "[t]he other [field sobriety] tests she seemed not able to perform." She contends that this is factually incorrect; that she "did complete

both of the tests," but they had little probative value because Curia failed to properly administer and document them.

¶ 48    Third, she suggests that the judge was confused the "timing of events" based on the judge's remark, in discussing the stop, that Tolliver said "some really bizarre things." Tolliver avers that she "did not say anything at all bizarre until well after the stop, when Curia was questioning her back at the police station." She suggests that if the judge "mis-recollected the timing of these statements it may well have led him to give them more probative value than they properly deserved, given their remoteness in time to when [defendant] was actually driving her car and the stressful circumstances in which they occurred."

¶ 49    According to Tolliver, these comments show the trial court "believed that the evidence of impairment was much stronger that it actually was," depriving her of a fair trial. In setting forth this argument, she acknowledges that her counsel "did not interrupt the court to object to its mis-recollection of evidence" at trial or raise this argument in a posttrial motion, as required to preserve the issue for appeal. *People v. Roman*, 2013 IL App (1st) 102853, ¶ 19 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Nevertheless, she argues that the issue should not be considered forfeited because "it falls under the constitutional error exception to waiver." In the alternative, she contends that we may review the issue under the plain error doctrine, which "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 50    The plain-error doctrine applies when " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred

and that error is so serious that it affected the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *Id.* (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

¶ 51    First, we determine whether an error occurred. *Thompson*, 238 Ill. 2d at 613. Regardless of whether the issue was forfeited, defendant must show that the trial court committed an error depriving her of the due process right to a fair trial. See *People v. Simon*, 2011 IL App (1st) 091197, ¶ 89. We find no error.

¶ 52    "Our supreme court has held that the failure of the trial court to recall and consider evidence that is crucial to a criminal defendant's defense is a denial of the defendant's due process." *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75 (citing *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992)). "Where the record affirmatively indicates that the trial court did not remember or consider the crux of the defense when entering judgment, the defendant did not receive a fair trial." *Simon*, 2011 IL App (1st) 091197, ¶ 91 (citing *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976)). On the other hand, "if a trial court's 'minor misstatement' of the evidence did not affect the basis of the ruling, it does not violate due process." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39 (citing *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107). "Whether a defendant's due process rights have been denied is an issue of law and, thus, our review is *de novo*." *Williams*, 2013 IL App (1st) 111116, ¶ 75.

¶ 53    Tolliver relies on *Mitchell*, 152 Ill. 2d 274 (1992), as well as this court's decisions in *Bowie,* 36 Ill. App. 3d 177 (1976) and *Williams*, 2013 IL App (1st) 111116. After reviewing these cases, we find them to be distinguishable. In *Mitchell*, our supreme court found that there was a due process violation where the trial court, in denying a motion to suppress a confession,

"erred in failing to recall and consider the crux of his defense at his motion to suppress [hearing], his testimony that he was not free to leave police custody." 152 Ill. 2d at 321. Although the defendant there had testified that police told him he could not leave the station, the trial court erroneously stated in its ruling that there was "no testimony that * * * the defendant at any time said he felt he could not leave." *Id*. at 307.

¶ 54    In *Bowie*, defendant was found guilty of battery following a bench trial, at which defendant and a police officer gave conflicting testimony as to which of them hit the other first. 36 Ill. App. 3d at 178-79. Defendant testified that the police officer hit him "and I grabbed my head and blood started rushing down." *Id.* But, when defense counsel referenced that testimony during closing argument, the court interjected and said "I heard nothing about * * * the defendant stating anything about that he was bleeding, strike that out." *Id.* at 180. Our court reversed and remanded, explaining: "Where the record affirmatively indicates, as in the instant case, that the trial judge did not remember or consider the crux of the defense when entering judgment, we hold that defendant did not receive a fair trial." *Id.*

¶ 55    In *Williams*, the only issue at trial was identification. 2013 IL App (1st) 111116, ¶ 4. A swab from bloody gloves found at the crime scene revealed a mixture of DNA indicating "at least three different people had worn the gloves." *Id*. ¶ 5. The State and defendant offered conflicting expert testimony. The State's expert opined that the sample matched defendant's DNA profile. *Id*. ¶ 7. Defendant's expert testified that an identification was impossible and that "all that could be concluded was that defendant could not be excluded as a possible contributor." *Id*. ¶ 8. Relying primarily on the DNA evidence to convict, the trial court "mistakenly stated" that the defense expert agreed with the State's expert that defendant had "certainly" contributed

to the DNA sample. *Id*. ¶ 9. On appeal, the defendant argued that he was denied due process because the trial court based its finding of guilt on a mistaken recollection of his expert's testimony. After reviewing *Mitchell* and *Bowie*, this court found that "the trial court's failure to recall crucial [DNA] testimony from the only defense witness was a due process violation." *Id*. ¶ 86.

¶ 56    Tolliver asserts the court violated her due process rights because it "misrecollected" the evidence in three respects: (i) "indications on the [HGN] test that she had been drinking" when that test was not completed; (ii) she "seemed not able to perform" the other field sobriety tests; and (iii) her saying "really bizarre things" reflected confusion because they occurred "after the stop, when Curia was questioning her back at the police station." We reject these contentions.

¶ 57    First, we are not persuaded that the trial court's statement about the HGN test is analogous to the misstatements of crucial defense evidence in *Bowie, Mitchell*, and *Williams*. Those cases involved situations where the trial court failed to remember or misstated testimony offered by the defense to contradict the State's evidence. By contrast, Tolliver did not offer any evidence at trial. Further, we cannot say that the court's statement regarding HGN test was "crucial," given the ample additional evidence of intoxication, including: clues of Tolliver's impairment on the two other field sobriety tests; the odor of alcohol on her breath, her bloodshot and glassy eyes, her slurred speech, and her refusal to comply with a breathalyzer test. Indeed, as discussed with respect to Tolliver's sufficiency of the evidence argument, the trial court did not need to rely on any field sobriety test to find she was intoxicated. Ample evidence of intoxication existed. So the alleged misstatement regarding that test cannot be deemed "crucial."

¶ 58    Also, in stating that there were "indications" from the HGN test that Tolliver had been drinking, constitutes making a permissible, reasonable inference from Curia's testimony. See *People v. Moon*, 2019 IL App (1st) 161573, ¶ 37 (rejecting argument that trial court inaccurately recalled defendant struck victim with key, where this "was not a misstatement of fact but, rather, a reasonable inference supported by the evidence"); *Simon*, 2011 IL App (1st) 091197, ¶¶ 94-95 (rejecting argument that trial court incorrectly recalled witness' testimony where "[w]hile it is possible to read the trial court's statement in that way" it was also "possible to read the statement as recounting [witness's] testimony and drawing an inference form that testimony.").

¶ 59    Curia testified that Tolliver was unable to follow the simple instructions to complete the HGN test, both when he explained it and again when a second officer attempted to administer the test. The trial court could reasonably infer that her repeated failure could serve as corroborating evidence of intoxication. For this additional reason, we find no error.

¶ 60    We likewise reject Tolliver's suggestion of error based on the statement that "[t]he other [field sobriety] tests she seemed not able to perform." She claims this misstates the evidence because she "did complete both of these tests and, due to the improper way in which they were administered, they could not yield any valid results indicating either that she was or was not impaired." But, the argument ignores Curia's unrebutted testimony that Tolliver showed several signs of impairment on both the walk-and-turn and one-leg stand tests. Also, rather than a misstatement of the evidence, the comment appears to be a reasonable inference supported by Curia's testimony that she showed multiple signs of intoxication in both tests. See *Moon*, 2019 IL App (1st) 161573, ¶ 37.

¶ 61    Finally, we find no merit that the comments about Tolliver's bizarre statements reflected "confusion about the timing of events," resulting in prejudice. Tolliver suggests the comments were inconsistent with the evidence since Curia testified that she made the statements in police custody, at least 20 minutes after he attempted to administer the field sobriety tests. This court has recognized that "if a trial court's 'minor misstatement' of the evidence did not affect the basis of the ruling, it does not violate due process." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39 (quoting *People v. Schuit*, 2016 IL App (1st) 150312, ¶107)). Even assuming that the trial court misstated the timing, at most, that is a minor misstatement of evidence. Tolliver has not articulated how this "misstatement" could have affected the basis for the court's guilty finding, let alone be considered "crucial" to her defense. *Mitchell*, 152 Ill. 2d at 323; see also *Williams*, 2017 IL App (1st) 150795, ¶ 40 (rejecting argument that alleged misstatement violated due process where "the trial court's statement regarding the physical evidence * * * did not bear on the 'crux' of Williams's defense.").

¶ 62    Indeed, even had Curia never made mention of bizarre statements, the trial court was entitled to find Tolliver was intoxicated based on Curia's other observations. In other words, assuming *arguendo* that the court was mistaken on the timing, we can hardly say this would have affected the ruling, depriving her of a fair trial.

¶ 63    As there was no error, we need not additionally discuss whether there was plain error. *Williams*, 2017 IL App (1st) 150795, ¶ 40 ("There was no error, let alone 'plain' error, and so we need not go further in the plain error analysis.")

¶ 64    Affirmed.