2020 IL App (1st) 181813-U

No. 1-18-1813

Order filed December 22, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 957 |
| | ) | |
| WILBUR DRIVER, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions for attempt armed robbery and aggravated unlawful use of a weapon are affirmed where the evidence established that the State's key witnesses testified credibly, and the trial court did not misstate the evidence in finding him guilty.

¶ 2    Following a bench trial, defendant Wilbur Driver was found guilty of attempt armed robbery (720 ILCS 5/18-2(a)(2) (West 2016); 720 ILCS 5/8-4(a) (West 2016)) and aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (3)(A-5) (West 2016)), and

sentenced to concurrent terms of 18 and 7 years' imprisonment, respectively. On appeal, defendant argues his convictions should be reversed because: the State failed to prove his guilt beyond a reasonable doubt where the court made credibility determinations that no rational trier of fact could have made; and the court denied him a fair trial by failing to correctly remember the evidence presented at trial in finding him guilty. We affirm.

¶ 3    Defendant was charged with one count of armed habitual criminal, two counts of attempt armed robbery, two counts of unlawful use or possession of a weapon by a felon, and four counts of AUUW stemming from an incident which took place on December 11, 2017. The AUUW counts charged defendant with possessing on or about his person a firearm, when not on his land or abode, without having been issued a currently valid Firearm Owner's Identification (FOID) card or license under the Firearm Concealed Carry Act.

¶ 4    At trial, Miguel Feliciano testified that on the date in question, sometime after 10:30 p.m., he was traveling with his friend "Larry" by car to another friend's house. When they arrived at the house, Feliciano exited the car, but Larry was asleep inside. Feliciano walked to the fence of the house where he "felt somebody behind" him, and, when he turned, he saw a man, whom he identified in court as defendant, pointing a gun at him. Defendant said "[g]ive me all of your money." Feliciano saw that defendant was "kind of close" to him so he pretended to reach for his pocket and then "turned around and went for the gun" because he "saw an opportunity to take it from him." Larry was still asleep in the car when this happened. After defendant reached for the gun with both hands, "he faced it to the floor, and [defendant] shot it." Both Feliciano and defendant had their hands on the gun when it fired. Feliciano could not tell if anyone had been shot when the gun went off.

¶ 5    After the gun went off, Feliciano struggled to take the gun away from defendant. Feliciano called to Larry, who grabbed defendant, and Feliciano was able to take the gun away from him. Feliciano held defendant down on the ground by lying on top of him. Larry was beside them "holding the gun and calling the police." Feliciano denied that four or five other people were helping him at that time, that he tried to rob defendant, and that he had ever seen defendant before.

¶ 6    When the police arrived, Feliciano told them what had happened that night, at which point he learned that defendant had been shot. Feliciano went to the hospital. He identified photographs of himself on the date of the incident, his injuries, the gun, and the scene of the crime which were subsequently admitted into evidence.

¶ 7    At the time that he testified, Feliciano had a pending drug case in criminal court, had been convicted in 2012 of a theft case for which he was sent to the Department of Corrections, and was given probation in 2009 on a burglary charge. Feliciano did not discuss the facts of the case with the assistant state's attorney and was not offered anything or threatened in exchange for his testimony.

¶ 8    On cross-examination, Feliciano stated that on the date in question he was "probably" going to his friend's house to "smoke some weed and do some drugs." He denied that he saw defendant "stumble" or act "a little drunk or goofy" or that defendant approached him to ask him for drugs. Feliciano denied that he planned to rob defendant and was the person with the gun. He also denied that he and Larry "stump [*sic*] [defendant] in the chest with [their] feet repeatedly." He further denied that Larry attempted unsuccessfully to shoot defendant, so he hit him in the head with the gun while people were watching. Feliciano explained that defendant was lying on the

ground when the police arrived because he was holding defendant down. Feliciano denied getting into his car and attempting to drive away when the police were on the scene.

¶ 9    On redirect examination, Feliciano testified that neither he nor Larry attempted to rob defendant, and he struggled with defendant after defendant attempted to rob him.

¶ 10    Larry Strkey testified that he was friends with Feliciano and on December 11, 2017, traveled with him to another friend's house. Feliciano was driving, and Strkey was sitting in the passenger's seat. Feliciano got out of the car, and Strkey only got out of the car when he heard Feliciano call for his help. Feliciano was at the house because he was "selling something" and Strkey was waiting in the car. Strkey next heard Feliciano "[w]hen he hollered" for his help, saying "Larry, he is trying to stick me up." Strkey also heard a gunshot before he got out of the car. When he got out of the car, he saw Feliciano struggling with a man while holding a gun. Strkey identified the man as defendant. He helped Feliciano gain control over the gun. When Strkey got the gun free, he hit defendant "upside the head with the gun," after which he and Feliciano took defendant to the ground. They held defendant on the ground and Strkey called 911. When the police arrived, Strkey told them what had happened. He denied that Feliciano had the gun with him when they went to the house, and that he and Feliciano were "out there gangbanging."

¶ 11    At the time he testified, Strkey had a pending drug case, as well as prior convictions for possession in 2007, 2009, 2013, and 2015. Strkey testified that he was not under the influence of drugs at the time he was testifying, had not discussed the facts of the case with the assistant state's attorney, and was not promised anything nor threatened in exchange for his testimony.

¶ 12    On cross-examination, Strkey stated "[t]he whole area is hot," referring to the neighborhood where the crime took place, and explained that people sold drugs there. He stated

Feliciano went to the house to sell drugs, but denied that he bought drugs from Feliciano. Feliciano sat outside "waiting for customers" while Strkey sat in the car. Strkey stated "[t]his guy came up" to Feliciano, but denied seeing him approach Feliciano. He did not see the gun before the struggle, or defendant attempt to rob Feliciano. Strkey denied kicking defendant in the chest and firing a shot at him; however, he "gave [defendant] some licks" and told the police he "whooped his ass." He hit defendant because defendant came there to rob someone, although Strkey did not see him do it. He denied trying to leave when the police arrived, because he called 911 and gave the police his name.

¶ 13    Chicago police officer Flores testified that he responded to the scene on December 11, 2017.[1] When Flores arrived, he saw defendant "[l]aying on the ground." Flores' body worn camera was on when he arrived, and he identified the footage as a true and accurate depiction of what transpired at the scene. Flores identified a photograph of Feliciano as being on the scene along with a person by the name of Larry Strkey. The State published the body camera footage.

¶ 14    The footage depicts police officers arriving at the scene with a man on the ground in the middle of the street and two other men standing nearby. The two men spoke to the police.

¶ 15    On cross-examination, Flores stated he had worked in the area before and recognized Feliciano and Strkey for previous narcotics activity. The State entered into evidence two certified copies of convictions for defendant from 2006 and 2000 and a certified abstract from the Illinois State Police which indicated it had no record on file of defendant having a Firearm Owners Identification (FOID) card or concealed carry license.

---

[1]Officer Flores did not state his first name on the record.

¶ 16    The State rested its case in chief, and defendant moved for a directed finding. The court granted defendant's motion with respect to Count I, armed habitual criminal, but denied it as to the other counts.

¶ 17    Chicago police officer Sanchez testified he was an initial responder at the scene of the incident on December 11, 2017.[2] On that date, he was wearing a body worn camera, and the resulting footage truly and accurately depicted the events of that night. Defendant published a clip from Sanchez's body camera footage.

¶ 18    The footage depicts Sanchez approaching two persons sitting in a car, who indicated they were going to go to the hospital. Sanchez told them to stay at the scene.

¶ 19    On cross-examination, Sanchez stated he interviewed both Feliciano and Strkey on the scene, which was captured on the body camera footage. During that time both Feliciano and Strkey stayed on the scene.

¶ 20    Defendant introduced an audio clip of a 911 call into evidence. The audio clip was published in open court. In the recording, a woman stated that she called 911 because a man was shot in the street, and "they [*sic*] out here kicking the man right here on the ground." She indicated she was watching from her window, and initially thought the men were helping him, but they were "killing him." The woman said two men were kicking the man on the ground, but a total of approximately six men were outside.

¶ 21    Defendant testified that on December 11, 2017, he was staying two blocks from where the incident occurred. At approximately 10:30 p.m., he was walking up the block when a man exited a car, approached him, and asked him what he was looking for. Defendant identified this man as

---

[2] Officer Sanchez did not state his first name on the record.

Feliciano. After he approached, defendant told Feliciano that he "was looking to buy some weed, and [Feliciano] told [defendant] to follow him."

¶ 22    After defendant followed Feliciano to the "front of a certain place of residence," Feliciano held a gun to him. Defendant reached for the gun, so Feliciano fired, which shot defendant in the top of his left hand. Defendant and Feliciano then "tussle[d]" on the ground, and Feliciano called for his friend Strkey, who took the gun and stood over him. Feliciano told Strkey to shoot the gun again, so Strkey "put the gun to [defendant's] head and pulled the trigger and the gun didn't go off." After the gun did not fire, Strkey began hitting defendant in the head with the gun, and defendant blacked out. He next remembered "a bunch of stomps and kicks," and hearing "a bunch of people" around him before blacking out again and waking up in the hospital. Defendant was treated for a gunshot wound in his hand and received four staples in the top of his head. Defendant identified photographs of himself at the hospital.

¶ 23    On cross-examination, defendant stated he "[b]riefly" remembered speaking with the police in the hospital, but "was under a lot of medication." According to defendant, when Feliciano approached him, he knew he was looking for drugs without saying anything, because "that block is known for selling drugs." Defendant followed Feliciano, who walked further away from his car and Strkey in order to sell him drugs, at which point defendant saw him fidgeting and pull out a gun. Defendant's instinct was to reach for the gun that Feliciano was holding before Feliciano demanded anything from him. Feliciano did not have a chance to shoot defendant in his body, because defendant reached for the gun when Feliciano raised it at waist height. Defendant speculated that after the gun discharged, people approached when they saw Feliciano and Strkey attacking him. Defendant told the police he was attacked because of "gang activity," as that was

what he assumed happened, although he acknowledged that Feliciano or Strkey did not flash any gang signs at him. Defendant stated that while he was under medication, he "might have told" detectives that he walked past a group of "four or five guys" who jumped him and shot him.

¶ 24    In rebuttal, the State offered defendant's certified convictions for a 2004 attempt murder and 2013 aggravated battery to a police officer for credibility purposes. In closing, the State argued Feliciano and Strkey remained on the scene to speak to the police. The State argued "[i]t makes absolutely no sense" that Strkey would call the police and subsequently stay on the scene and speak to them if he was involved in a mass beating of defendant. Defense counsel argued that defendant testified honestly that he was at the scene to purchase drugs when Feliciano and Strkey jumped him, which was corroborated by the 911 call admitted into evidence. He argued that Feliciano and Strkey were not credible, and the evidence did not corroborate their stories.

¶ 25    The court found defendant guilty of attempt armed robbery and AUUW without having been issued a valid license under the Firearm Concealed Carry Act. [3] In announcing its finding, the court believed Feliciano's and Strkey's testimony concerning the circumstances of the offense, noting "not that they're angels in this case." The court also noted it believed "that [Feliciano] and [Strkey] were out on the street together," because Feliciano was going to sell drugs, when "they encountered [defendant] and they describe that he tried to rob them." After the scuffle where defendant was shot, "they went and beat the heck out of him tuning (*sic*) him up for what he had

_____

[3]In its oral ruling, the court found defendant guilty of "unlawful use of a weapon by a felon without a Firearm Owner's Identification Card or conceal carry card," (Counts IV, V, VI, VII, VIII and IX). At a status hearing, the court stated "everything merged" into the attempt armed robbery charge. However, during sentencing, the court indicated defendant was found guilty of "having a gun with a felony record," and "aggravated unlawful use of a weapon by a felon" and sentenced him to seven years' imprisonment for the offense. The mittimus reflects defendant was convicted of AUUW (count VI, which charged defendant with possession of a firearm without a valid concealed carry license).

just tried to do." The court found it particularly significant that "Strkey—they called the police and they waited for the police to get there" and the woman who called the police did not say who shot who or what had specifically happened, "just that somebody got shot and they were beating him up." The court believed the testimony that Feliciano and Strkey were beating defendant because he had just tried to rob them, and defendant had gotten shot with his own gun. The court noted defendant "robbed the wrong people," because they were "resourceful," got control of the gun, and held him until the police arrived.

¶ 26    The court denied defendant's amended motion to reconsider, stating that "looking at the evidence in totality," it found the State met its burden of proof, and the court had no reason to believe it was in error in making its credibility findings. The court sentenced defendant to concurrent terms of 18 years' imprisonment for the attempt armed robbery conviction and 7 years' imprisonment for the AUUW conviction. While admonishing defendant of his right to appeal, the court also clarified that while it "found [defendant's] story * * * to be preposterous and perjurous (*sic*)," it did not consider it in sentencing him.

¶ 27    On appeal, defendant first contends that his convictions should be reversed because the State failed to prove beyond a reasonable doubt that he attempted to rob Feliciano where no rational trier of fact could have found him guilty based on the evidence presented at trial.

¶ 28    The standard of review in challenging the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The trier of fact, here the trial judge, is responsible for resolving conflicts in the testimony, weighing the evidence, and

drawing reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. Accordingly, this court will not retry the evidence or substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or credibility of witnesses. *Id*. A reviewing court will not reverse a criminal conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). For the following reasons, we find the evidence sufficient to support defendant's conviction.

¶ 29    To sustain defendant's conviction for attempt armed robbery as charged, the State had to prove beyond a reasonable doubt that defendant attempted to knowingly take property from the person of presence of another by the use of force or threatening the imminent use of force while armed with a firearm. 720 ILCS 5/18-2(a)(2) (West 2016); 720 ILCS 5/8-4(a) (West 2016). To sustain defendant's conviction for AUUW, the State had to prove beyond a reasonable doubt that he carried a firearm on his person, which was uncased, loaded, and immediately accessible at the time of the offense and he had not been issued a currently valid license under the Firearm Concealed Carry Act. 720 ILCS 5/24-1.6(a)(1), (3)(A-5) (West 2016).

¶ 30    In this court, defendant does not dispute any of the specific elements of either offense. Rather, he argues the State's main witnesses, Feliciano and Strkey, were incredible because of various inconsistencies in their testimony coupled with their criminal record. He maintains that he presented a more "credible and cogent" version of events, albeit having provided an inconsistent statement while medicated.

¶ 31    Viewing the evidence in the light most favorable to the State, we find a rational trier of fact could conclude beyond a reasonable doubt that defendant committed attempt armed robbery and

AUUW. Feliciano testified defendant held a gun to him and told him to give him all of his money. Feliciano struggled with defendant over the gun, and Strkey helped subdue defendant. Strkey corroborated Feliciano's testimony regarding the struggle over the gun. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (The testimony of a single witness, if positive and credible, is sufficient to convict, even if contradicted by defendant). Strkey called the police who arrived at the scene and interviewed both him and Feliciano regarding the incident. The body camera footage introduced into evidence showed the officers' arrival, with defendant on the ground and Feliciano and Strkey standing nearby. The State introduced evidence that defendant had two prior felony convictions and did not have either a valid FOID card or concealed carry license. This evidence, and the reasonable inferences therefrom, was sufficient to sustain defendant's conviction for attempt armed robbery and AUUW.

¶ 32     Defendant nevertheless argues no rational trier could have found him guilty beyond a reasonable doubt based on the evidence provided at trial, because Feliciano and Strkey provided contradictory testimony regarding the incident and testified in a manner contrary to human experience. Namely, defendant questions a number of purported inconsistencies in Feliciano and Strkey's testimony regarding the sequence of events of the alleged robbery, whether Feliciano was selling drugs at the time of the incident, and whether Strkey saw defendant approach Feliciano. Defendant argues his testimony that he approached Feliciano to purchase drugs, and Feliciano attempted to rob him as a result, was more credible than Feliciano and Strkey's version of events.

¶ 33     Additionally, he argues Feliciano and Strkey each stated they were at the address for different purposes, namely to visit different friends, with Strkey testifying Feliciano was at the address to sell drugs, but Feliciano testifying he was there to "smoke some weed and do some

drugs." Further, Feliciano testified he called out to Strkey after defendant was shot, but Strkey said he was drawn to the scene by either Feliciano's yelling or when he heard the gunshot. Defendant also points out that Feliciano and Strkey attempted to leave the scene of the crime before the police questioned them, as shown by body camera footage admitted into evidence. Lastly, he argues the credibility of both Feliciano and Strkey is undermined by their prior convictions, and pending drug charges. Defendant contends his testimony is more credible, despite inconsistencies in his testimony due to being under the influence of medication when questioned.

¶ 34     Although defendant claims the inconsistent testimonies of Feliciano and Strkey compel the conclusion that no rational trier of fact would have found their testimonies credible, he is actually asking this court to impermissibly reweigh the evidence and draw inferences from basic facts to ultimate facts. As mentioned, the trier of fact, in this case the trial judge, is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences therefrom. *People v. Brown*, 2013 IL 114196, ¶ 48. We will not substitute our judgment for that of the trial court's regarding such inferences and credibility determinations. See *id*. Indeed, the purported inconsistencies in Feliciano and Strkey's testimonies are relatively minor points that were explored at trial during cross-examination. Minor inconsistencies in testimony between witnesses may affect the weight of the evidence but do not automatically create reasonable doubt of guilt. *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85. "[I]t is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004).

¶ 35     Here, in announcing its ruling, the trial court noted that it believed Feliciano and Strkey's version of events rather than defendant's, and specifically pointed out that Feliciano and Strkey

were not "angels" in the situation. However, the court emphasized the fact that they called the police as a strong factor indicative of their credibility in this situation. While it is possible that Feliciano and Strkey attempted to rob defendant, it is equally possible that he attempted to rob them. *People v. Newton*, 2018 IL 122958, ¶ 27 (" 'The inference to be drawn [from the evidence] need not be the only conclusion logically to be drawn; it suffices that the suggested inference may be reasonably drawn therefrom' ") (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 401.1, at 147 (9th ed. 2009)). Accordingly, taking the evidence in a light most favorable to the State, we find a rational trier of fact could have concluded defendant committed attempt armed robbery and AUUW. Stated differently, the evidence presented is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt.

¶ 36    Defendant next argues that the trial court misremembered the evidence in finding him guilty and thereby deprived him of his due process right to a fair trial. As an initial matter, the parties disagree about whether defendant forfeited this argument, as he did not timely object to the alleged error during the trial. *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) (holding that to preserve claims for appeal and avoid forfeiture, a defendant "must both object at trial and include the alleged error in a written posttrial motion). Defendant argues the forfeiture rule should be relaxed in this case, because "a defendant need not interrupt a trial court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court." *People v. Mitchell*, 152 Ill. 2d 274, 324 (1992).

¶ 37    Alternatively, defendant argues that the trial court's misstatement of the evidence is reviewable under the first prong of the plain error doctrine, because "it amounts to a credibility contest." See *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (The plain-error doctrine applies

when a clear or obvious error occurred and * * * "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error.' ") (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)); see also *People v. Johnson*, 2012 IL App (1st) 091730, ¶¶ 47-48 (the court considered the evidence closely balanced where the State presented witnesses who could have reasonably had a motive to fabricate evidence against defendant). Nevertheless, "[w]hether we consider the issue on the merits or through the lens of a plain error analysis, the first step is to determine whether error occurred." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 89. Here, we find no error.

¶ 38    A trial court is required to consider all matters in the record before deciding the case. *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). Therefore, "a trial court's failure to recall and consider testimony crucial to defendant's defense [will result] in a denial of defendant's due process rights." *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992). A defendant will not have received a fair trial where the record " 'affirmatively indicates * * * that the trial judge did not remember or consider the crux of the defense when entering judgment.' " *Simon*, 2011 IL App (1st) 091197, ¶ 91 (citing *Bowie*, 36 Ill. App. 3d at 180). Whether a defendant's due process rights have been violated is a legal issue to be reviewed *de novo*. *People v. Williams*, 2013 IL App (1st) 111116, ¶ 75.

¶ 39    However, "[i]n a bench trial, the trial court is presumed to have considered only competent evidence in reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91. Additionally, as noted above, the judge in a bench trial has the responsibility to weigh the evidence, resolve conflicts, and draw reasonable inferences, and thus the State has the benefit of all reasonable inferences. *People v. Moon*, 2019

IL App (1st) 161573, ¶ 36. Further, "if a trial court's 'minor misstatement' of the evidence did not affect the basis of the ruling, it does not violate due process." *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39 (quoting *People v. Schuit*, 2016 IL App (1st) 150312, ¶ 107).

¶ 40    After reviewing the record, we find the trial court did not deny defendant his due process rights in rendering its judgment. Defendant argues that the court misstated the trial evidence where it stated that Feliciano and Strkey were "out on the street together," where "they" encountered defendant who attempted to rob "them." Further, the court stated "they" got possession of the gun and "they" beat defendant, before "they" called the police. Defendant argues that in a case resting on credibility, that the court's grouping together of Feliciano and Strkey's testimony where they did not testify consistently as to these points indicated the court mistakenly believed their stories corroborated one another.

¶ 41    Despite defendant's contention, the court's statements during its ruling are not affirmative evidence that it misremembered the trial evidence. Indeed, the evidence in the record supports the court's statement that Feliciano and Strkey were "out on the street together." Both Feliciano and Strkey testified that Feliciano was on the street and Strkey in the vehicle when defendant held Feliciano at gunpoint and demanded his money. They testified that Feliciano called for Strkey's assistance and they struggled with defendant over the gun. They testified that, after taking the gun from defendant, Strkey held it and called the police. As noted above, the two testimonies are substantively consistent with one another. At most, the court's grouping the actions of both witnesses using the term "they" is a minor misstatement of the evidence, and defendant has provided no evidence, other than his own speculation, that such a misstatement affected the court's

ruling. See *Williams*, 2017 IL App (1st) 150795, ¶ 39. Accordingly, we find no error or denial of due process based on the court's statements.

¶ 42    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 43    Affirmed.